# EXHIBIT  2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )     CDC No. H-70748
                          )
SAMUEL CONTRERAS          )
                          )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 14, 2005

8:45 A.M.

PANEL PRESENT:

Ms. Margarita Perez, Presiding Commissioner
Mr. Rufus Morris, Deputy Commissioner

OTHERS PRESENT:

Mr. Samuel Contreras, Inmate
Ms. Marsha Hurst, Attorney for Inmate
Mr. Jack Delavigne, Deputy District Attorney, Los
Angeles County
Interpreter (Unidentified)
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**Rheanna Bernard, Peters Shorthand Reporting**

ii

INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 13 |
| Pre-Commitment Factors | 21 |
| Parole Plans | 30 |
| Post-Commitment Factors | 42 |
| Closing Statements | 41 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 52 |
| Transcriber Certification | 53 |

--oOo--

1

| 1 | **P R O C E E D I N G S** |
| 2 | **PRESIDING COMMISSIONER PEREZ:** This is a |
| 3 | subsequent parole consideration hearing for |
| 4 | inmate Samuel Contreras, CDC number H-70748. |
| 5 | Today's date is December 14, 2005. We are |
| 6 | located at the Correctional Training Facility in |
| 7 | Soledad.  The time is 8:45 A.M.  According to |
| 8 | the record, sir, you were received by the |
| 9 | department on March 30, 1993 out of the county |
| 10 | of Los Angeles for the offense of murder-second |
| 11 | with use of firearm, Penal Code Section 187 and |
| 12 | Penal Code Section 1202.5(A), case number |
| 13 | EA001712, count 1; for which you were |
| 14 | subsequently assessed a term of fifteen years to |
| 15 | life plus two years with a minimum eligible |
| 16 | parole date of April 14, 2001. |
| 17 | Sir, this hearing is being tape recorded |
| 18 | and for the purposes of voice identification we |
| 19 | are going to go around the room and ask everyone |
| 20 | to identify themselves, stating their first |
| 21 | name, last name, spelling their last name.  When |
| 22 | we get to you, sir, if I could ask you to |
| 23 | provide us with your CDC number as well.  I will |
| 24 | start with myself and go to my left.  My name is |
| 25 | Margarita Perez, P-E-R-E-Z, Commissioner with |
| 26 | the Board of Parole Hearings. |
| 27 | **DEPUTY COMMISSIONER MORRIS:** Rufus Morris, |

2

1   M-O-R-R-I-S, Deputy Commissioner.

2          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Jack

3   Delavigne, D-E-L-A-V-I-G-N-E, Deputy District

4   Attorney, Los Angeles County.

5          **ATTORNEY HURST:** Marsha Hurst, H-U-R-S-T,

6   Councel for Mr. Contreras.

7          **INMATE CONTRERAS:** Samuel Contreras, C-O-

8   N-T-R-E-R-A-S, CDC number is H-70748.

9          **PRESIDING COMMISSIONER PEREZ:** Thank you

10  very much sir.  I do note for the record that we

11  have two correctional officers in the room.

12  They will not be participating in today's

13  hearing.  They are hear for the purposes of

14  security.  Sir, before we begin, there is a

15  light blue document in front of you.  Would you

16  read that out loud for me please?

17          **INMATE CONTRERAS:**

18      "American's With Disabilities' Act, ADA,

19      is a law that helps people with disability.

20      Disabilities are problems that make it

21      harder for some people to see, hear,

22      breath, talk, walk, learn, think, work or

23      take care of themselves then it is for

24      others.  Nobody can be kept out of public

25      places or activities because of a

26      disability.  If you have a disability you

27      the right to ask for help to get ready for

3

1       your Board of Parole Hearing, BPH, get to

2       the hearing, talk, read forms and paperwork

3       and understand the hearing process.  BPH

4       will look at what you have asked to make

5       sure that you have a disability covered by

6       the ADA and that you have asked for the

7       right kind of help.  If you do not get help

8       or if you don't think you got the kind of

9       help you need ask for a BPH 1070 grievance

10      form.  You can also get help in filling

11      that out."

12          **PRESIDING COMMISSIONER PEREZ**: Very good

13  sir.  Can you tell me what that means in your

14  own words?

15          **INMATE CONTRERAS**: If somebody needs help

16  or if you have a disability, you will be

17  providing some kind of help for them.

18          **PRESIDING COMMISSIONER PEREZ**: It means

19  that if you require some sort of accommodation

20  for today's hearing you can certainly request

21  it, and if you don't receive it you can file a

22  grievance form.  And I do note for the record

23  that on January 13, 2005 you signed a BPT form

24  1073, in which you indicated that you did not

25  have disability.  There is another document in

26  the file which indicates that you requested a

27  Spanish interpreter, but only for the purpose of

4

1    translating your letters that are in Spanish

2    into English.  Is that correct?

3           INMATE CONTRERAS: Yes, that's correct.

4           PRESIDING COMMISSIONER PEREZ: You've been

5    in the US since you were about six years old, is

6    that right?

7           INMATE CONTRERAS: Yes.

8           PRESIDING COMMISSIONER PEREZ: And you

9    have a GED.

10          INMATE CONTRERAS: Yes.

11          PRESIDING COMMISSIONER PEREZ: So you

12    understand English pretty well.

13          INMATE CONTRERAS: Very well.

14          PRESIDING COMMISSIONER PEREZ: Very well,

15    and you read it very well obviously.  Do you

16    need glasses?

17          INMATE CONTRERAS: No.

18          PRESIDING COMMISSIONER PEREZ: Are you

19    hearing impaired?

20          INMATE CONTRERAS: No.

21          PRESIDING COMMISSIONER PEREZ: Have you

22    ever, or are you currently on psychotropic

23    medications?

24          INMATE CONTRERAS: No.

25          PRESIDING COMMISSIONER PEREZ: Are you on

26    any kind of medication whatsoever?

27          INMATE CONTREAS: High blood pressure

5

1   medication and high cholesterol.

2         **PRESIDING COMMISSIONER PEREZ:** High

3   cholesterol.  But the side effects of that

4   medication won't make it difficult for you to

5   participate in today's hearing?

6         **INMATE CONTRERAS:** No.

7         **PRESIDING COMMISSIONER PEREZ:** Very good

8   sir.  Counsel, have all ADA issues been

9   addressed to the best of your knowledge?

10        **ATTORNEY HURST:** Yes, they have.

11        **PRSESIDING COMMISSIONER PEREZ:** Very good.

12  Sir, this hearing is being conducted pursuant to

13  Penal Code Sections 3041 and 3042 and the rules

14  and regulations of the Board of Parole Hearings,

15  governing parole consideration hearings for life

16  inmates.  If at any time during today's hearing

17  you don't understand something that we say or if

18  we're talking to fast, I want you to let us know

19  so that we can back up and make sure that you do

20  understand before we proceed forward.  Do you

21  understand sir?

22        **INMATE CONTRERAS:** Yes.

23        **PRESIDING COMMMISSIONER PEREZ:** Very good.

24  Sir, the purpose of today's hearing is once

25  again consider your suitability for parole.  In

26  doing so we will consider the number and nature

27  of the crimes you were committed, your prior

6

1   criminal and social history, as well as your

2   behavior and programming since your arrival

3   within the California Department of Corrections

4   and Rehabilitation.  Commissioner Morris and

5   myself have had the opportunity to review your

6   record, and during today's hearing sir, you will

7   have the opportunity to correct or clarify that

8   record.

9        We will reach a decision today and inform

10  you of that decision.  If we do find you

11  suitable for parole we will explain the length

12  of your confinement to you, okay?  The hearing

13  will be conducted in two phases.

14       Before we recess for deliberations the

15  District Attorney, your attorney and you will

16  have the opportunity to make a closing

17  statement.  Your statement should be limited to

18  why you feel you are suitable for parole.  We

19  will then recess, clear the room and deliberate.

20  Once we've concluded our deliberations we will

21  resume the hearing and announce our decision.

22       The California Code of Regulations

23  states, "Regardless of time served, life inmates

24  shall be found unsuitable for and denied parole

25  if in the judgement of the panel the inmate

26  would pose and unreasonable risk of danger to

27  society."  Do you understand that sir?

7

1        **INMATE CONTRERAS:** Yes.

2        **PRESIDING COMMISSIONER PEREZ:** Very good.

3   Sir at today's hearing you have certain rights.

4   You have the right to a timely notice of this

5   hearing, you have the right to present relevant

6   documents and you have the right to review your

7   Central File.  We do note for the record that on

8   January 12, 2005 you were provided the

9   opportunity to review you Central File.  Is that

10  correct sir?

11       **INMATE CONTRERAS:** Yes, that's correct.

12       **PRESIDING COMMISSIONER PEREZ:** Very good.

13  Did you in fact review it?

14       **INMATE CONTRERAS:** Yes.

15       **PRESIDING COMMISSIONER PEREZ:** Very good.

16  Counsel, have your client's rights been met.

17       **ATTORNEY HURST:** Yes.

18       **PRESIDING COMMISSIONER PEREZ:** Thank you.

19  Sir you have an additional right, and that is

20  the right to be heard by and impartial panel.

21  Do you have any objections to today's panel?

22       **INMATE CONTRERAS:** No.

23       **PRESIDING COMMISSIONER PEREZ:** Counsel, do

24  you have any objections today's panel?

25       **ATTORNEY HURST:** I don't, no.

26       **PRESIDING COMMISSIONER PEREZ:** Sir, you

27  will receive a copy of our written tentative

8

1    decision today.  That decision become effective

2    within 120 days.  In the future you will receive

3    a copy of a decision as well as a copy of

4    today's transcript, okay?

5          The Board has eliminated its appeals

6    process.  It's kind of like the 602 process with

7    the institutions.  So what that means is that if

8    you disagree with anything that occurs during

9    today's hearing you can go directly to the court

10   with your complaint.  Do you understand?

11         **INMATE CONTRERAS:** Yes.
12         **PRESIDING COMMISSIONER PEREZ:**

13   Commissioner Morris, is there confidential

14   information in the inmate's file and will we be

15   utilizing it during today's hearing.

16         **DEPUTY COMMISSIONER MORRIS:** One minute

17   here.  No confidential material at all.

18         **PRESIDING COMMISSIONER PEREZ:** Very good,

19   thank you.

20         **INMATE CONTRERAS:** Would it be possible

21   for me to introduce some material, some

22   objections to the uses of the POR –

23         **PRESIDING COMMISSIONER PEREZ:** Not yet.

24         **INMATE CONTRERAS:** Not yet, okay.

25         **ATTORNEY HURST:** When she asks.

26         **PRESIDING COMMISSIONER PEREZ:** We'll get

27   there.  Sir, during today's hearing you are not

9

1   required to admit your offense.  Nor are you

2   required to discuss the offense.  However, it's

3   important for you to understand that this panel

4   does accept as true the findings of the court.

5   We are not here to retry your case.  We are here

6   to determine whether or not you are suitable for

7   parole, okay?  Do you understand that?

8        **INMATE CONTRERAS:** Yes.

9        **PRESIDING COMMISSIONER PEREZ:** Okay, very

10  good.  Sir, I have passed a checklist marked

11  Exhibit 1 to your counsel to ensure that we are

12  all operating off the same documents; and at

13  this time I would ask her to verify the accuracy

14  of that checklist.

15       **ATTORNEY HURST:** Well I'm sure I have the

16  documents, but I don't see the checklist as a

17  matter of fact.

18       **PRESIDING COMMISSIONER PEREZ:** Did you

19  look underneath your - underneath your -

20       **ATTORNEY HURST:** Yes, that's where it is.

21  Okay, yes I do have the documents.

22       **PRESIDING COMMISSIONER PEREZ:** I would ask

23  the same question of the Deputy District

24  Attorney.

25       **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** I

26  have them, thank you.

27       **PRESIDING COMMISSIONER PEREZ:** You can

10

1   just toss it over there, thank you.   Here.
2   Counsel, do you have additional documents to
3   give to the panel today?
4       **ATTORNEY HURST:** Well we do, there will
5   be, but Mr. Savala is translating them at the
6   present time.
7       **PESIDING COMMISSIONER PEREZ:** Very good.
8       **ATTORNEY HURST:** Some support letters.
9       **PRESIDING COMMISSIONER PEREZ:** And they
10  are support letters.   So, when we get to your
11  parole plans we'll have the interpreter come in
12  so he can cover those letters that are in
13  Spanish.   How many letters do you have in
14  Spanish?
15      **INMATE CONTRERAS:** In Spanish, there is
16  probably like seven.
17      **PRESIDNG COMMISSIONER PEREZ:** Seven, okay,
18  because there are a number of them in your file
19  that have already been translated, so are these
20  -
21      **ATTORNEY HURST:** We checked though, they
22  are additional.
23      **PRESIDING COMMISSIONER PEREZ:** Additional?
24  Very good.   Counsel, any objections?
25      **ATTORNEY HURST:** Yes, there is an
26  objection and my client has prepared a written
27  objection so I'm going to have him introduce it

11

1   at this time.

2         PRESIDING COMMISSIONER PEREZ: And I have

3   a copy here.

4         INMATE CONTRERAS: Yes, there is two

5   copies.  One for the DA and one for the

6   Commissioner.  Just look at it –

7         PRESIDING COMMISSIONER PEREZ: Tell me

8   what your objection is.  Would you like to tell

9   me what your objection is?

10        INMATE CONTRERAS: Yes, my objection is to

11  the usage of the POR that describes me as

12  attacking the victim when there was never any

13  such thing proven in court; and also the gang

14  allegation that they bring on the POR was never

15  proven.   It was an allegation only and I

16  managed to take it off with certain exhibits

17  that I've placed on the form that I gave you.

18  There is a two-page exhibit – there is a two-

19  page letter (indiscernible) exhibits to the gang

20  allegation and some statements of what happened

21  the night in questions that the victim did.  I'd

22  like for you to consider.

23        PRESIDING COMMISSIONER PEREZ: Okay.  We

24  will certainly consider them during our

25  deliberations.  These documents were provided to

26  us right before we started this hearing, so we

27  haven't been able to go through them entirely,

12

1  but we will consider them during our

2  deliberations.

3         **INMATE CONTRERAS:** Thank you.

4         **PRESIDING COMMISSIONER PEREZ:** Okay?  Any

5  other objections?

6         **ATTORNEY HURST:** No, none.  There is an

7  appellate report in this too.  I don't know if

8  the prior hearing that the statement of facts

9  has been taken from the POR or not.

10        **PRESIDING COMMISSIONER PEREZ:** Yes, and I

11 do note that there is an appellate (inaudible).

12 Will your client be speaking with us?

13        **ATTORNEY HURST:** Yes, he will.

14        **PRESIDING COMMISSIONER PEREZ:** And you'll

15 have an opportunity - you've had a hearing

16 before - you had an initial hearing so you'll

17 have an opportunity to correct or clarify the

18 record regarding what happened at the time of

19 the crime, okay?  Before we begin sir, I do need

20 to swear you in.  So if you could raise your

21 right hand?  Do you solemnly swear, or affirm,

22 that the testimony that you provide today will

23 be truth, the whole truth and nothing but the

24 truth?

25        **INMATE CONTRERAS:** I do.

26        **PRESIDING COMMISSIONER PEREZ:** Very good.

27 Sir, I'd like to start out by incorporating into

13

1    the record specific information regarding the

2    summary of the crime.  What I will do is I will

3    take it from the counselor's report dated

4    February 2004.  This report was prepared by

5    Correctional Counselor 1 L. Vucina, V-U-C-I-N-A.

6    The record states that,

7        "On December 9, 1989 at approximately

8        11:30 P.M. Octiano Perez, the victim, went

9        to the 7Eleven store located at 12022 Van

10       Owens Street in North Hollywood.  He was

11       accompanied by Robert Cruz and Sebastian

12       Hernandez.  Cruz went into the store and

13       Hernandez stood next to the vehicle.  The

14       victim was in the backseat and Contreras,

15       his co-defendant Oriano, and an unknown

16       suspect walked by the victim.  Co-defenant

17       Oriano stated "Eighteenth Street" and the

18       victim replied "West-side playboys."  After

19       this Contreras and Oriano began attacking

20       the victim.  At some point the defendant

21       shot the victim two times with a .22

22       caliber revolver.  The victim was

23       transported to Holy Cross hospital and was

24       pronounced dead at approximately 3:30 A.M.

25       on December 9, 1989. According to the

26       incident report the defendant admitted to

27       shooting the victim after he was booked at

14

1      the Van Nyes jail."

2          Let me ask you a question sir.  Did you

3  shoot and kill the defendant?

4          **INMATE CONTRERAS:** Yes I did.

5          **PRESIDING COMMISSIONER PEREZ:** Is the

6  information that I've read into the record, is

7  it accurate to the best of your recollection?

8          **INMATE CONTRERAS:** Except for the part

9  where they say that I attacked the victim,

10  everything is right.

11          **PRESIDING COMMISSIONER PEREZ:** So you are

12  saying that you didn't attack him physically?

13          **INMATE CONTRERAS:** Yes.

14          **PRESIDING COMMISSIONER PEREZ:** You didn't

15  attack him physically?

16          **INMATE CONTRERAS:** That's what I'm saying,

17  that I not.

18          **PRESIDING COMMISSIONER PEREZ:** But you

19  shot and killed him?

20          **INMATE CONTRERAS:** Yes.

21          **PRESIDING COMMISSIONER PEREZ:** Well, then

22  tell me what happened sir?

23          **INMATE CONTRERAS:** At the night in

24  question, we went to a - we were at a party and

25  my friends had ran out of beer.  They asked me

26  if I could go and buy beer for them, which I

27  agreed to, and went to a 7Eleven store, went

15

1    inside the store to buy beer.  My friends were
2    under twenty-one so I didn't want to take them
3    inside the store with me.  At that time, they
4    stayed outside the store, I went inside the
5    store to buy the beer the other car arrived and
6    this whole thing transpired while I was inside
7    the store.

8        **PRESIDING COMMISSIONER PEREZ:** What's this
9    whole thing?

10       **INMATE CONTRERAS:** The fight that was
11   going on?

12       **PRESIDING COMMISSIONER PEREZ:** Tell me -
13   what what?

14       **INMATE CONTRERAS:** The fight that you read
15   about - the guys started shouting gang slogans
16   back and forth and when I got out of the store I
17   had seen this guy hit my friend in the head with
18   a bottle -

19       **PRESIDING COMMISSIONER PEREZ:** What guy?
20       **INMATE CONTRERAS:** That guy in the
21   backseat of the car, (Indiscernible) Hernandez.
22       **PRESIDING COMMISSIONER PEREZ:** Okay.
23       **INMATE CONTRERAS:** And so I panicked, I
24   got a gun that I had in my car and tried to stop
25   this individual.  I shot once.  It appeared he
26   continued coming, I shot again - he went back
27   into his car and took off.

16

1        **PRESIDING COMMISSIONER PEREZ:** Do you

2   think maybe you overreacted?

3        **INMATE CONTRERAS:** Yes.

4        **PRESIDING COMMISSIONER PEREZ:** What were

5   you doing with a gun?

6        **INMATE CONTRERAS:** I used to work for a

7   furniture sale store and I used to take large sums of

8   money to the bank and I had it for my own protection

9   and just being dumb.

10        **PRESIDING COMMISSIONER PEREZ:** Was it

11   registered?

12        **INMATE CONTRERAS:** No.

13        **PRESIDING COMMISSIONER PEREZ:** So it

14   wasn't legal?

15        **INMATE CONTRERAS:** It was legal, it was

16   under my name, but it wasn't - actually it was

17   because I bought it, but I didn't have

18   permission to carry it.

19        **PRESIDING COMMISSIONER PEREZ:** You said

20   that you had the weapon because you used to work

21   for a furniture sale company and you had to

22   deposit money to a bank?

23        **INMATE CONTRERAS:** Yes.

24        **PRESIDING COMMISSIONER PEREZ:** Why did you

25   commit this crime sir?

26        **INMATE CONTRERAS:** I believe my immaturity

27   - couple that with a couple of things that had

17

1   happened in my life - lead me to an irrational

2   decision to use a weapon.  I never intended to

3   really kill this individual.

4        **PRESIDING COMMISSIONER PEREZ:** What

5   happened in your life that would cause you to

6   react that way on the day of the offense?

7        **INMATE CONTRERAS:** I had two - three of my

8   brothers got killed - my father and two of my

9   brothers had gotten killed.  I had been stabbed

10  (indiscernible) by different individuals, I was

11  going through a divorce at the time and I was

12  separated from my wife. I was using drugs.

13  Couple that with just being immature, I guess,

14  lead me to the dumb choice that I did.

15       **PRESIDING COMMISSIONER PEREZ:** Your father

16  and two of your brothers were killed.  They were

17  killed by somebody else.

18       **INMATE CONTRERAS:** Yes.

19       **PRESIDING COMMISSIONER PEREZ:** They were

20  killed all at one time or in separate instances?

21       **INMATE CONTRERAS:** No, my father was a

22  police officer in Mexico.  He got killed in the

23  line of duty. I had a brother who was a soldier

24  -

25       **PRESIDING COMMISSIONER PEREZ:** In Mexico?

26       **INMATE CONTRERAS:** Yes.  I had a little

27  brother that was shot and killed in a drive by

18

1  shooting here.  That was separate times.  I was

2  stabbed and put in a coma for almost ten days -

3       **PRESIDING COMMISSIONER PEREZ:** As a

4  result?  What were the circumstances with that?

5       **INMATE CONTRERAS:** I was coming out of a

6  church and I was talking to this girl and this

7  guy just came out of nowhere and just stabbed

8  me.  Why, I don't know.  Maybe I was talking to

9  his girl.

10       **PRESIDING COMMISSIONER PEREZ:** Let me ask

11  you this question.  I've listened to your

12  response that you were immature.  Okay, and we

13  are all immature at some part in our lives but

14  we don't kill people.  So, I'm having difficulty

15  accepting your answer that immaturity was a

16  reason why you drew a weapon and why you were

17  being threatened, kill another individual -

18  twice, you shot him with a revolver, killing

19  him.  So, I want you to give a little bit more

20  thought and I'll ask you again why you committed

21  this crime?

22       **INMATE CONTRERAS:** First of all, my

23  intentions were never to kill the individual.

24  My intention were to shoot him in the leg to

25  stop him.  I tried shooting him in the leg.  I

26  thought I had missed the first time and I raised

27  my weapon again and I fired, thinking that I had

19

1  missed him the first time, but my intentions

2  were never to kill this individual. My

3  intentions were only to immobilize him.

4         **PRESIDING COMMISSIONER PEREZ:** But that

5  didn't answer my question of why you committed

6  the offense. Were you being threatened? Was

7  there a knife to your throat?

8         **INMATE CONTRERAS:** No.

9         **PRESIDING COMMISSIONER PEREZ:** Was

10  somebody pointing a gun at you?

11         **INMATE CONTRERAS:** I believe I was just

12  scared of the whole thing that was going on. I

13  didn't know how many people were really involved

14  with - in the other car at that time, which is

15  (indiscernible) this individual and that was my

16  reaction.

17         **PRESIDING COMMISSIONER PEREZ:** Were you a

18  gang member?

19         **INMATE CONTRERAS:** No.

20         **PRESIDING COMMISSIONER PEREZ:** Were the

21  people you were with gang members?

22         **INMATE CONTRERAS:** Yes I believe so.

23         **PRESIDING COMMISSIONER PEREZ:** So you were

24  an associate as a minimum?

25         **INMATE CONTRERAS:** No.

26         **PRESIDING COMMISSIONER PEREZ:** You were

27  associating, hanging out with gang members?

20

1      **INMATE CONTRERAS:** They were at a party.

2  We went to the liquor store from there.  I

3  wasn't associated with them.

4      **PRESIDING COMMISSIONER PEREZ:** How many

5  individuals went to the store to get beer with

6  you?

7      **INMATE CONTRERAS:** There were a girl and

8  three other guys?

9      **PRESIDING COMMISSIONER PEREZ:** Were all of

10  them gang members?

11      **INMATE CONTRERAS:** To my best

12  recollection, yes.

13      **PRESIDING COMMISSIONER PEREZ:** And you

14  knew them all obviously if you were all hanging

15  out together in your vehicle, or somebody's

16  vehicle.

17      **INMATE CONTRERAS:** I knew two of them.

18      **PRESIDING COMMISSIONER PEREZ:** And they

19  were all gang members.

20      **INMATE CONTRERAS:** Two of them were.

21      **PRESIDING COMMISSIONER PEREZ:** So two of

22  the four were gang members.

23      **INMATE CONTRERAS:** Yes.

24      **PRESIDING COMMISSIONER PEREZ:** How do you

25  feel about this crime today sir?

26      **INMATE CONTRERAS:** I feel that if I could

27  take it all over again and just erase it or do

1    something for the victim to make it up for them,

2    I would certainly do it.  I feel very sorry for

3    what happened knowing that he has son.  I've

4    been on both sides of the coin, I know how it

5    feels.  I had prior, written to the family and

6    apologized to them.  I send the letter to the

7    DA, asking them if they could mail it to them

8    but I have gotten no response from them.  I want

9    to let them know that it was nothing their

10   father did that brought upon this nonsense, but

11   it's just something that immature people or

12   people that don't really know how to use their

13   brain, do and I feel very remorseful for it.

14          **PRESIDING COMMISSIONER PEREZ:** Thank you

15   sir.

16          **INMATE CONTRERAS:** Your welcome.

17          **PRESIDING COMMISSIONER PEREZ:** In terms

18   of your criminal history, the record reflects

19   that you don't have a juvenile criminal history,

20   is that right?

21          **INMATE CONTRERAS:** That's right.

22          **PRESIDING COMMISSIONER PEREZ:** The record

23   does reflect that in terms of your adult

24   criminal history, in 1987 you were arrested by

25   the Los Angeles Police Department for a couple

26   of vehicle code violations.

27          **INMATE CONTRERAS:** Yes.

22

1          **PRESIDING COMMISSIONER PEREZ:** You were

2     subsequently convicted of driving with a

3     suspended license and for driving without a

4     valid license, is that right?

5          **INMATE CONTRERAS:** Yes.

6          **PRESIDING COMMISSIONER PEREZ:** Why was

7     your license suspended?

8          **INMATE CONTRERAS:** Reckless driving.

9          **PRESIDING COMMISSIONER PEREZ:** Reckless

10    driving.  Did you drive recklessly once?

11         **INMATE CONTRERAS:** More then once

12    (indiscernible) –

13         **PRESIDING COMMISSIONER PEREZ:** How many

14    times?

15         **INMATE CONTRERAS:** Three times.

16         **PRESIDING COMMISSIONER PEREZ:** Three

17    times.  Were you under the influence of alcohol

18    or anything?

19         **INMATE CONTRERAS:** Yes.

20         **PRESIDING COMMISSIONER PEREZ:** All three

21    times?

22         **INMATE CONTRERAS:** Yes.

23         **PRESIDING COMMISSIONER PEREZ:** Then in

24    1989 you, again, were arrested by the Los

25    Angeles Police Department and you were

26    subsequently of driving with a suspended

27    license. Okay.  You didn't learn your lesson two

23

1  years earlier sir?

2      **INMATE CONTRERAS:** Unfortunately I didn't.

3      **PRESIDING COMMISSIONER PEREZ:** You didn't,

4  okay.  Then I show that about five, six months

5  later you were arrested for the commitment

6  offense, right?

7      **INMATE CONTRERAS:** Yes.

8      **PRESIDING COMMISSIONER PEREZ:** Did you

9  have an alcohol problem?

10      **INMATE CONTRERAS:** I believe so.

11      **PRESIDING COMMISSIONER PEREZ:** When did

12  you start drinking?  At what age?

13      **INMATE CONTRERAS:** Probably about sixteen

14  years old.

15      **PRESIDING COMMISSIONER PEREZ:** Was there

16  any point where you felt that you were drinking

17  to excess?

18      **INMATE CONTRERAS:** I think I was self-

19  medicating myself with all these problems that

20  were going on, and that was one of the ways of

21  dealing with all these problems that I had going

22  on at that point in time in my life.

23      **PRESIDING COMMISSIONER PEREZ:** I'm sorry, I'm

24  not sure I heard the response.  At what age did you

25  feel you started drinking to excess?  At what point do

26  you believe you were drinking way too much?

27      **INMATE CONTRERAS:** Probably about twenty-one.

24

1          **PRESIDING COMMISSIONER PEREZ:** Twenty-one.  What

2    were you self-medicating for?

3          **INMATE CONTRERAS:** Very low self-esteem,

4    believing that nobody cared about me –

5          **PRESIDING COMMISSIONER PEREZ:** Why's that?

6          **INMATE CONTRERAS:** Having my parents taken away

7    from me, my wife leaving me and the person that I was

8    living with at the time leaving me.  Just not having a

9    real education, not really seeing a future in life.

10         **PRESIDING COMMISSIONER PEREZ:** Is there anything

11   else you'd like to add to correct or clarify the

12   record regarding your criminal history?

13         **INMATE CONTRERAS:** No.

14         **PRESIDING COMMISSIONER PEREZ:** Your personal

15   factors – how old were you when your dad was deceased?

16         **INMATE CONTRERAS:** I was probably four years

17   old.

18         **PRESIDING COMMISSIONER PEREZ:** Is your mother

19   still alive?

20         **INMATE CONTRERAS:** No, she's deceased.

21         **PRESIDING COMMISSIONER PEREZ:** When did she die?

22         **INMATE CONTRERAS:** She died in 1995.

23         **PRESIDING COMMISSIONER PEREZ:** '95.  You grew up

24   with your mother.

25         **INMATE CONTRERAS:** Yes.

26         **PRESIDING COMMISSIONER PEREZ:** Did you have a

27   stepfather?

25

1          **INMATE CONTRERAS:** No.

2          **PRESIDING COMMISSIONER PEREZ:** At what age did

3    you move out of your mother's residence?

4          **INMATE CONTRERAS:** I was probably nineteen years

5    old.

6          **PRESIDING COMMISSIONER PEREZ:** Nineteen.  So you

7    lived with your mom up until you were nineteen.

8          **INMATE CONTRERAS:** Yes.

9          **PRESIDING COMMISSIONER PEREZ:** So what's this

10   business about your parents leaving you – or your

11   mother leaving you.  You moved out when you were an

12   adult.

13         **INMATE CONTRERAS:** Not in the sense leaving me,

14   but just feeling that they weren't paying attention to

15   me and just not being able to talk to them because of

16   the whole thing that I had in my head.

17         **PRESIDING COMMISSIONER PEREZ:** Which is what?

18         **INMATE CONTRERAS:** Low self-esteem, not being

19   able to speak –

20         **PRESIDING COMMISSIONER PEREZ:** Why couldn't you

21   speak?

22         **INMATE CONTRERAS:** Why couldn't I speak?  Nobody

23   ever taught me how to communicate before.  Here –

24         **PRESIDING COMMISSIONER PEREZ:** No one ever

25   taught you how to communicate?

26         **INMATE CONTRERAS:** Not really.  Right now I'm

27   taking courses, communication courses, to know – to

26

1  convey my ideas, to know how to talk to people and

2  make sure that they understand where I'm coming from.

3  But before I could not do that.

4          **PRESIDING COMMISSIONER PEREZ:** You have two

5  brothers?

6          **INMATE CONTRERAS:** Yes.

7          **PRESIDING COMMISSIONER PEREZ:** Did you say one

8  of them is deceased?

9          **INMATE CONTRERAS:** I had three brothers, one of

10 them is deceased now.

11         **PRESIDING COMMISSIONER PEREZ:** So you currently

12 have a brother who is a machinist and another that's a

13 store manager.

14         **INMATE CONTRERAS:** Yes.

15         **PRESIDING COMMISSIONER PEREZ:** And you also have

16 a sister.

17         **INMATE CONTRERAS:** Yes.

18         **PRESIDING COMMISSIONER PEREZ:** Do you keep in

19 touch with them?

20         **INMATE CONTRERAS:** Yes.

21         **PRESIDING COMMISSIONER PEREZ:** Do they live here

22 in the US?

23         **INMATE CONTRERAS:** Yes.

24         **PRESIDING COMMISSIONER PEREZ:** And how are they

25 doing?

26         **INMATE CONTRERAS:** They are doing pretty well.

27         **PRESIDING COMMISSIONER PEREZ:** They are doing

27

1   well, okay.  You are married?

2           INMATE CONTRERAS: Yes.

3           PRESIDING COMMISSIONER PEREZ: And how long have

4   you been married?

5           INMATE CONTRERAS: Close to fourteen years now.

6           PRESIDING COMMISSIONER PEREZ: Fourteen years.

7   And how did you meet your wife?

8           INMATE CONTRERAS: I meant her out on the

9   street, but we kept in touch while I was in here and

10  we married while I was in here.

11          PRESIDING COMMISSIONER PEREZ: You married while

12  you were in here?

13          INMATE CONTRERAS: Yes.

14          PRESIDING COMMISSIONER PEREZ: You came to CDC

15  in 1994, right?

16          INMATE CONTRERAS: '93, yes.

17          PRESIDING COMMISSIONER PEREZ: So that was

18  twelve years ago, which would indicate that you were

19  married prior to coming to the department and that you

20  indicated that you've been married for fourteen years.

21          INMATE CONTRERAS: No, I met her before I came

22  to institution, sorry.

23          PRESIDING COMMISSIONER PEREZ: How long have you

24  been married?

25          INMATE CONTRERAS: I got married on April 14,

26  1994.

27          PRESIDING COMMISSIONER PEREZ: '94, okay.  So

28

1  you've been married around eleven years.

2          INMATE CONTRERAS: Yes.

3          PRESIDING COMMISSIONER PEREZ: What does she do

4  for a living?

5          INMATE CONTRERAS: She's a registered nurse.

6          PRESIDING COMMISSIONER PEREZ: She lives in

7  Montebello?

8          INMATE CONTRERAS: Yes.

9          PRESIDING COMMISSIONER PEREZ: Does she have

10  children?

11          INMATE CONTRERAS: Yes.

12          PRESIDING COMMISSIONER PEREZ: How many?

13          INMATE CONTRERAS: She's got a daughter, that's

14  my stepdaughter; and we've got a son that we

15  procreated while I was in here.

16          PRESIDING COMMISSIONER PEREZ: And how old is

17  she?

18          INMATE CONTRERAS: She is thirty-three.

19          PRESIDING COMMISSIONER PEREZ: Thirty-three.  Do

20  you keep in touch with your wife on a regular basis?

21          INMATE CONTRERAS: Yes.

22          PRESIDING COMMISSIONER PEREZ: When was the last

23  time she visited you?

24          INMATE CONTRERAS: About a year ago I'd say.

25          PRESIDING COMMISSIONER PEREZ: Do the children

26  come up and visit you as well?

27          INMATE CONTRERAS: Who?

29

1            **PRESIDING COMMISSIONER PEREZ:** The children?

2            **INMATE CONTRERAS:** Yes.  Sorry.

3            **PRESIDING COMMISSIONER PEREZ:** The record

4    reflects that you started using Black Beauties on a

5    regular basis at the age of thirteen, right?

6            **INMATE CONTRERAS:** Yes.

7            **PRESIDING COMMISSIONER PEREZ:** And you used to

8    use alcohol at the same time.  You admit to the past

9    use of marijuana, PCP and cocaine, right?

10            **INMATE CONTRERAS:** Yes.

11            **PRESIDING COMMISSIONER PEREZ:** Very good.  Did

12    you feel at any point in time in your life that you

13    were addicted to any drugs, other then maybe Black

14    Beauties?

15            **INMATE CONTRERAS:** Yes.

16            **PRESIDING COMMISSIONER PEREZ:** Okay, what drugs?

17            **INMATE CONTRERAS:** Cocaine.

18            **PRESIDING COMMISSIONER PEREZ:** When did you

19    start using cocaine?

20            **INMATE CONTRERAS:** I'd say when I was about

21    twenty.

22            **PRESIDING COMMISSIONER PEREZ:** Twenty, okay?

23    Use it on a regular basis?

24            **INMATE CONTRERAS:** Yes.

25            **PRESIDING COMMISSIONER PEREZ:** Up until the

26    commitment offense?

27            **INMATE CONTRERAS:** Yes.

30

1          **PRESIDING COMMISSIONER PEREZ:** Were you under

2     the influence of anything at the time of the offense

3     other then alcohol?

4          **INMATE CONTRERAS:** Yes, cocaine also.

5          **PRESIDING COMMISSIONER PEREZ:** Cocaine and

6     alcohol.  Is there anything else that you'd like to

7     add regarding your personal factors?

8          **INMATE CONTRERAS:** No.

9          **PRESIDING COMMISSIONER PEREZ:** In terms of your

10    residence plans, sir, you plan to live with your wife

11    in Montebello upon your release to parole.  Is that

12    still accurate?

13         **INMATE CONTRERAS:** Right now we're going through

14    some problems.  She's beginning to believe that maybe

15    I'm not going to get out of here – this is the fourth

16    time coming in here and she says that I don't get a

17    date this time around she's beginning to think she's

18    better off by herself.  So, we don't know – I think

19    I'd be better off with my brother until we clear this

20    whole thing up.

21         **PRESIDING COMMISSIONER PEREZ:** Your brother,

22    where does he live?

23         **INMATE CONTRERAS:** Palmdale.

24         **PRESIDING COMMISSIONER PEREZ:** So your brother

25    is willing to provide you with a residence?

26         **INMATE CONTRERAS:** Yes.

27         **PRESIDING COMMISSIONER PEREZ:** In Palmdale, in

31

1    the event things don't work out with your wife?

2            **INMATE CONTRERAS:** Yes.

3            **PRESIDING COMMISSIONER PEREZ:** Do you have any

4    other residence plans?

5            **INMATE CONTRERAS:** All of my brothers would be

6    willing to take me.  They've got letters of support

7    which state –

8            **PRESIDING COMMISSIONER PEREZ:** You have two

9    brothers total, so your other brother as well?

10           **INMATE CONTRERAS:** My brother and my sister

11   also.

12           **PRESIDING COMMISSIONER PEREZ:** Brother and

13   sister.  In terms of your employment plans, the record

14   reflects that you have a job offer with

15   (Indiscernible) Machine.

16           **INMATE CONTRERAS:** Yes.

17           **PRESIDING COMMISSIONER PEREZ:** And what kind of

18   work would you be doing –

19           **INMATE CONTRERAS:** As a machinist.

20           **PRESIDING COMMISSIONER PEREZ:** As a machinist.

21   You have experience in that area?

22           **INMATE CONTRERAS:** Yes.

23           **PRESIDING COMMISSIONER PEREZ:** Within the

24   institutions?

25           **INMATE CONTRERAS:** Within the institutions I

26   have done computer work and I –

27           **PRESIDING COMMISSIONER PEREZ:** As a machinist?

32

1          **INMATE CONTRERAS:** Well, computers — they use

2    computer (indiscernible) control to make parts so

3    that's what (indiscernible) computers (inaudible).

4          **PRESIDING COMMISSIONER PEREZ:** Let me read into

5    the record, sir, your letters of support.  We're not

6    going to read them word by word.  I'm most interested

7    in those that offer you employment and residence,

8    okay.  We have one letter from Veronica Punzi, a

9    social worker, and this letter was received on June

10   20, 2005 and she's your niece, is that right?

11          **INMATE CONTRERAS:** Yes.

12          **PRESIDING COMMISSIONER PEREZ:** She writes that,

13       "My family is very proud of what my uncle has

14       accomplished and want him to be able to use all

15       of his knowledge and tools out in the real world.

16       My parents have recently invested in several

17       rental properties in Kern County.  If my uncle

18       needed a place of his own he would definitely

19       have somewhere to go.  He can also have a job by

20       helping my parents manage the apartments and have

21       some extra time to further his education.  If he

22       decides to live in the San Fernando Valley where

23       my parents and older brother own a home, he is

24       also welcome to stay at either home.  He can also

25       gain employment in the machine shop my brother

26       manages and owns.  My other older brother owns a

27       home in the San Gabriel Valley and would be happy

33

1          to have him live with him and help him go to
2          college, since he helped finance my uncle's
3          paralegal classes.  My sister is currently
4          attending college and will be helping him if he
5          wanted to attend college in the valley.  I can
6          help him find resources in his paroling process.
7          These services can include job assistance and
8          counseling services to help adjust to returning
9          back to the community after so many years away
10         from it.  I believe my uncle will always have my
11         support and that of my whole family."
12              Then we have a letter April 19, 2005 from –
13     lets see, Angela Punza, is that another one of your
14     nieces?
15              **INMATE CONTRERAS:** No, that's my sister.
16              **PRESIDING COMMISSIONER PEREZ:** Your sister,
17     okay, that's your sister.  And she does indicate that
18     she is your sister and in the letter she does convey
19     her support for you and she further indicates that she
20     feels that you are repentant for the crime.  She
21     further states that,
22          "I, my husband and children are available to
23          help my brother in everything that would be
24          possible as we have been doing until that moment.
25          We have a lot of plans for when my brother goes
26          free and I know that with our help he can move
27          forward and be a good man.  More then anything, a

1         service to the community.  I ask you to please

2         consider giving him freedom.  I think he ahs

3         learned his lesson and you can see him there for

4         sixteen years without meddling in any problem;

5         and more then anything, following the rules and

6         regulations that demonstrate to you that he can

7         and is ready to be integrated into society."

8              Then we have a letter from – and it's

9    (Indiscernible) Contreras? That's your brother right?

10             **INMATE CONTRERAS:** Yes, that's my brother.

11             **PRESIDING COMMISSIONER PEREZ:** And I don't see a

12   date on this letter.  In the letter he states that,

13             "The purpose of this letter is to reiterate

14        what was written in previous letters, that I'm

15        ready to support my brother in any way possible

16        and plead to you for his release.  Soon I will

17        start business which will give me the ability to

18        employ my brother."

19             And what kind of business would that be

20   sir?

21             **INMATE CONTRERAS:** (Indiscernible) machine

22   shop.

23             **PRESIDING COMMISSIONER PEREZ:** The machine

24   shop.  Which you said he's already started?

25             **INMATE CONTRERAS:** Last time I spoke to

26   him, which was about a week ago, he still has

27   the plans going.

35

1        **PRESIDING COMMISSIONER PEREZ:** Okay.   When

2   does he plan to have the business up and

3   running?

4        **INMATE CONTRERAS:** He thinks it will be up

5   and running in about six months.

6        **PRESIDING COMMISSIONER PEREZ:** Six months.

7   Then we have a letter from Yolanda Marin.   Who

8   is she sir?

9        **INMATE CONTREREAS:** That's one of my

10  friends from Mexico.

11       **PRESIDING COMMISSIONER PEREZ:** One of your

12  friends from Mexico.   She does indicate that you

13  and she have been friends since childhood.   She

14  conveys here support for you and indicates that

15  "I can offer my home in case he has no place to

16  go."   She lives in (Indiscernible), Colorado?

17       **INMATE CONTRERAS:** Yes.

18       **PRESIDING COMMISSIONER PEREZ:** "Economic

19  help to the extent that I can and for seeking

20  work."   Then we have – can I have the

21  interpreter come in now?   Thank you.   We have a

22  couple more letters – one actually – from

23  Raphael Contreras (Indiscernible).   That's your

24  brother?

25       **INMATE CONTREREAS:** That's my brother, my

26  big brother.

27       **PRESIDING COMMISSIONER PEREZ:** Your big

1  brother.  And he writes,

2      "My name is Rafael Contreras

3      (Indiscernible), the eldest son of Samuel.

4      These are a few words from my view, but I

5      have sent many letters of support for my

6      brother and want to let you know that up to

7      this moment those letters are still

8      current, with unconditional support for my

9      brother in any way or condition that is to

10     my reach.  I am a supervisor of a company

11     that employs five hundred employees and I

12     would like to hire my brother.  The name of

13     the company is Cabo Yaught (Inaudible)."

14     **INMATE CONTRERAS:** It's in Palmdale.

15     **PRESIDING COMMISSIONER PEREZ:** In

16  Palmdale.

17     **INMATE CONTRERAS:** They got a letter from

18  my wife that I didn't see you (inaudible) –

19     **PRESIDING COMMISSIONER PEREZ:**

20  (Inaudible).  And when was this letter received

21  sir?  I don't see a date on it.

22     **INMATE CONTRERAS:** I gave it to the

23  counselor about two weeks ago.

24     **PRESIDING COMMISSIONER PEREZ:** Would this

25  be your wife and the two kids?

26     **INMATE CONTRERAS:** Yes.

27     **PRESIDING COMMISSIONER PEREZ:** Your wife

37

1    Yvette Contreras and the two kids, Louis and
2    Michelle, and Gregory Contreras.  In the letter
3    she writes, "My husband and I have been married
4    for about fourteen years."  That's inaccurate,
5    we've established that, right.  "During this
6    long period of time I've stayed in contact with
7    my husband and seen lost of positive changes in
8    him."  She goes on to talk about some of the
9    accomplishments within the institutions, as well
10   as your participation in self-help.  She further
11   states,

12        "As you may be able to see, in spite of
13        the harsh circumstances, my husband has
14        continued to use his time wisely to prepare
15        himself for the day he's allowed to re-
16        enter society.  Upon my husband's release,
17        my family and I will provide Samuel with a
18        home, financial, moral and spiritual
19        support.  What is more important, however,
20        we will provide him with a family who loves
21        and cares very much for him.  If given a
22        second chance, my children and I will be
23        there awaiting his return with open arms."
24        You have about seven other letters of
25   support, sir?
26        **INMATE CONTRERAS:** Yes.
27        **PRESIDING COMMISSIONER PEREZ:** It's not

38

1  necessary that you translate every single word

2  because I do see that some of those letters are

3  pretty lengthy.  I'm most interested in who they

4  are from and what message they're conveying.  I

5  don't think it's necessary that you go through

6  all the work of writing them out –

7          INTERPERTER: I was just doing it for my

8  own benefit so that I could –

9          PRESIDING COMMISSIONER PEREZ: Okay, you

10  were?  Very good.  So, would you just let us

11  know who they are from and what in general the

12  message is and if they are offering residence or

13  employment, then we are certainly interested in

14  that.

15          INTERPRETER: Sure, this one is from a

16  cousin.  It's (Indiscernible) Trevas and towards

17  the end he says "(Indiscernible) clothes and

18  work here and my home (Indiscernible)."  Is that

19  basically it?

20          PRESIDING COMMISSIONER PEREZ: Is there

21  anything else in that letter that you think is

22  significant that you want to convey?

23          INMATE CONTRERAS: Oh he's a dentist and

24  he's got his own practice as a dentition so that

25  might be relevant –

26          PRESIDING COMMISSIONER PEREZ: So your

27  saying he's offering you employment as –

39

1          **INMATE CONTRERAS:** Yes.

2          **PRESIDING COMMISSIONER PEREZ:**

3    (Indiscernible).  Does the letter say he's

4    offering you employment?

5          **INMATE CONTRERAS:** That's what he says on

6    the bottom.

7          **PRESIDING COMMISSIONER PEREZ:** And what

8    employment - what specific area - what would you

9    be doing?  Do you know?

10         **INMATE CONTRERAS:** No I don't, sorry.

11         **PRESIDING COMMISSIONER PEREZ:** Now you

12   have a US/INS hold?

13         **INMATE CONTRERAS:** Yes.

14         **PRESIDING COMMISSIONER PEREZ:** Were you in

15   this country legally when you came?

16         **INMATE CONTRERAS:** Yes, I came in legally.

17         **PRESIDING COMMISSIONER PEREZ:** Did you end

18   up getting a green card and becoming a citizen

19   and all that?

20         **INMATE CONTRERAS:** I got a green card and

21   then I became arrested (indiscernible) a

22   citizen.

23         **PRESIDING COMMISSIONER PEREZ:** So you're

24   not a citizen.  So you have a potential of being

25   deported?

26         **INMATE CONTRERAS:** Yes.

27         **PRESIDING COMMISSIONER PEREZ:** Go ahead

40

1  sir.

2       **INTERPRETER:** This other letter is from

3  his aunt, Maria Del Carmen Nevarro.  And she

4  says, among other things, "I can help him to do

5  positive and productive things, and will help

6  him by giving him good advice.  I offer him my

7  home that is in Milpia (Indiscernible)."  She

8  provides a telephone number.  The third letter I

9  really have a hard time with.

10       **INMATE CONTRERAS:** (Indiscernible).

11       **INTERPRETER:** (Indiscernible).  Okay, his

12  Uncle (indiscernible).  I didn't - I just

13  started on this one so I don't really know what

14  it says.

15       **PRESIDING COMMISSIONER PEREZ:** You read

16  the letter, right?

17       **INMATE CONTRERAS:** Yes.

18       **PRESIDING COMMISSIONER PEREZ:** What's the

19  gist of the letter sir?

20       **INMATE CONTRERAS:** He owns a ranch in

21  Mexico and he would also offer me a place to say

22  and to help him take care of the cattle at his

23  ranch.

24       **PRESIDING COMMISSIONER PEREZ:** Is that in

25  (Indiscernible)?

26       **INMATE CONTRERAS:** Yes.

27       **PRESIDING COMMISSIONER PEREZ:** Is that a

41

1  state?

2         INMATE CONTRERAS: Yes.

3         PRESIDING COMMISSIONER PEREZ: State,

4  okay.  Were there other letters?  I thought

5  there was seven letters?

6         INMATE CONTRERAS: No, that was just the

7  ones in Spanish that he had translate.

8         PRESIDING COMMISSIONER PEREZ: So that was

9  the gist of the letter?

10        INMATE CONTRERAS: Yes.

11        PRESIDING COMMISSIONER PEREZ: That's from

12  your uncle.  So, you have an aunt and uncle and

13  cousin?

14        INMATE CONTRERAS: And a cousin, yes.

15        PRESIDING COMMISSIONER PEREZ: Sir, are

16  there any other letters of support, offers of

17  employment, offers of residence, that have not

18  been turned into the record?

19        INMATE CONTRERAS: No.

20        PRESIDING COMMISSIONER PEREZ: So we've

21  covered them all.

22        INMATE CONTRERAS: Yes we have.

23        PRESIDING COMMISSIONER PEREZ: Sir,

24  pursuant to Penal Code Sections 3042, notices

25  were sent to agencies that would have a direct

26  interest in your case such as the public

27  defender's office in the event you were

42

1    represented by the public defender, the district

2    attorney's office, law enforcement and the

3    Superior Court.  We do note for the record, by

4    law, they have the right to comment and provide

5    an opinion to us on your opinion of your

6    suitability for parole.  By law, the District

7    Attorney has the right to be here.  None of

8    those entities that we notified responded to us,

9    giving us in opinion regarding today's hearing;

10   but we do have, as you know a representative

11   from the District Attorney's office will be

12   making a statement prior to the conclusion of

13   this hearing.  Sir, do you see any need – any

14   further need for the interpreter?

15            **INMATE CONTRERAS:** No.

16            **PRESIDING COMMISSIONER PEREZ:** You can

17   stay, you can hang out –

18            **INTERPRETER:** (Indiscernible) outside.

19            **PRESIDING COMMISSIONER PEREZ:** All right,

20   very good.  Thank you.  At this time I would ask

21   Commissioner Morris to discuss with you post-

22   conviction factors.

23            **DEPUTY COMMISSIONER MORRIS:** Mr. Contreras.

24   You are about forty-one years old today?

25            **INMATE CONTRERAS:** Yes.

26            **DEPUTY COMMISSIONER MORRIS:** This is a

27   subsequent hearing number three.  Looks like

43

1    your last hearing was May 19, 2004.  Prior to

2    that it seems like you had a hearing in '03, you

3    received a one year denial at that time.

4            **INMATE CONTRERAS:** Yes.

5            **DEPUTY COMMISSIONER MORRIS:** And that

6    brought you to this hearing.

7            **INMATE CONTRERAS:** Yes.

8            **DEPUTY COMMISSIONER MORRIS:** Let me just

9    quickly go through your movement through CDC.

10   Let me recap that.  I see that you were received

11   March 30, 1993 at the CCI reception center.  May

12   of '93 you were transferred to state prison in

13   Los Angeles County.  July of '98 you were

14   transferred to CTF and it looks like you've been

15   here since that time.

16           **INMATE CONTRERAS:** Yes.

17           **DEPUTY COMMISSIONER MORRIS:** I'm looking

18   at a classification score.  Minimum score 19,

19   that's as low as you can go. I also see you

20   completed a GED in 2001.

21           **INMATE CONTRERAS:** Yes.

22           **DEPUTY COMMISSIONER MORRIS:** Now I don't

23   see any other academic upgrading.  Have you done

24   anything else academically besides the GED?

25           **INMATE CONTRERAS:** Before that I completed

26   auto-mechanics in 19 -

27           **DEPUTY COMMISSIONER MORRIS:** Not

44

1    vocations, just straight academics.

2          INMATE CONTRERAS: Academics.

3          DEPUTY COMMISSIONER MORRIS: Did you take

4    any collegiate correspondence course, anything

5    like that?

6          INMATE CONTRERAS: I took a paralegal

7    course.  I completed it, just barely -

8          DEPUTY COMMISSIONER MORRIS: No other

9    general education courses.

10         INMATE CONTRERAS: Not yet.

11         DEPUTY COMMISSIONER MORRIS: I'm going get

12   to that paralegal in a minute.  I have not

13   overlooked that okay?  So in terms of a base

14   education you've got the GED.  You completed

15   that in 2001.  Now with regard to disciplinaries

16   - since your last hearing there are no

17   disciplinaries, no blue paper in your file at

18   all.  The last 115 you received was in 1995 and

19   that was reduced to a 128A.

20         INMATE CONTRERAS: Yes.

21         DEPUTY COMMISSIONER MORRIS: So you have

22   no 115s.  Regarding negative chronos.  The last

23   time you got a negative chrono was the one dated

24   5/5/95 and that was the reduced CDC 115.  Looks

25   like the only other negative chronos you

26   received was very, very soon after you arrived

27   in prison, November of '93, refusing to tuck in

45

1   your shirt.  September of '94, failure to report
2   to an assignment, both minor offenses. With
3   regard to vocations, you mentioned something
4   about the paralegal.  Now what I see here is – I
5   saw something about – I saw a chrono that talked
6   about an electronic technician certification.
7   That chrono was dated 2003.  I only saw two
8   chronos, so did you complete an electronic
9   completion class.
10          **INMATE CONTRERAS:** (Inaudible).
11          **DEPUTY COMMISSIONER MORRIS:** So you're
12   still working on that?
13          **INMATE CONTRERAS:** Yes.
14          **DEPUTY COMMISSIONER MORRIS:** And you've
15   been working on that since, what, 2003?
16          **INMATE CONTRERAS:** Since 2002 I believe.
17          **DEPUTY COMMISSIONER MORRIS:** Looks like
18   you've done a lot of stuff with computers.   I
19   see that you've – it's look like you've
20   completed a computer repair class.
21          **INMATE CONTRERAS:** Yes.
22          **DEPUTY COMMISSIONER MORRIS:** You did that
23   and you have a certification on that.
24   Consistent with that, I think I saw something
25   about you participating in computers for
26   schools, something about the repair of about 87
27   computers, something like that.

46

1        **INMATE CONTRERAS:** They give us some
2    computers to fix for public schools, so we
3    donate them back to the school to help the kids
4    out.   That was a project we were working on.
5        **DEPUTY COMMISSIONER MORRIS:** Was that at
6    this institution?
7        **INMATE CONTRERAS:** Yes.
8        **DEPUTY COMMISSIONER MORRIS:** So you've
9    done that once, twice?
10       **INMATE CONTRERAS:** We worked on a lot of
11   them, but they just gave us that chrono for
12   that.
13       **DEPUTY COMMISSIONER MORRIS:** Okay, that's
14   a good one.
15       **INMATE CONTRERAS:** Thank you.
16       **DEPUTY COMMISSIONER MORRIS:** Regarding –
17   so you've got the cert for repair.   How about
18   auto-mechanics?
19       **INMATE CONTRERAS:** I completed that – I
20   believe it was '97.
21       **DEPUTY COMMISSIONER MORRIS:** What about
22   graphic arts?
23       **INMATE CONTRERAS:** Graphic arts was
24   completed in 1995 I believe.
25       **DEPUTY COMMISSIONER MORRIS:** Then, your
26   most recent vocational effort is the paralegal
27   course you completed in March of 2005.

47

1          INMATE CONTRERAS: Yes.

2          DEPUTY COMMISSIONER MORRIS: And I saw the

3   certification in the miscellaneous section in

4   here.  Now you told me you were currently

5   involved in the electronic technician course.

6          INMATE CONTRERAS: (Inaudible).

7          DEPUTY COMMISSIONER MORRIS: Any other

8   vocations you're working on, anything else?

9          INMATE CONTRERAS: I'm working on some

10  business courses, but that's just on my own free

11  time, by myself.

12         DEPUTY COMMISSIONER MORRIS: That takes me

13  to self-help.  As you discussed with the

14  Commissioner a few minutes ago, you talked about

15  alcohol use?

16         INMATE CONTRERAS: Yes.

17         DEPUTY COMMISSIONER MORRIS: PCP use,

18  cocaine use and I think marijuana as well.

19         INMATE CONTRERAS: Yes.

20         DEPUTY COMMISSIONER MORRIS: And Black

21  Beauties.

22         INMATE CONTRERAS: Yes.

23         DEPUTY COMMISSIONER MORRIS: As a result

24  of that I'm going to ask you about what you've

25  done in the area of self-help.  I noticed there

26  is an addendum here with just a laundry list of

27  things that you have done here in the recent

48

1    past, since the last hearing.

2            **INMATE CONTRERAS:** Yes.

3            **DEPUTY COMMISSIONER MORRIS:** It reads like

4    you took to heart what they were telling you at

5    your last hearing.

6            **INMATE CONTRERAS:** Yes.

7            **DEPUTY COMMISSIONER MORRIS:** They told you

8    to be disciplinary free.  They told you to

9    participate in self-help and they told you to

10   earn positive chronos and it certainly reads

11   like you've done all of that.  I'm looking at an

12   addendum document here with eleven entries,

13   things that you've completed.  You've completed

14   a learning improvement course, 6/15/05.  You

15   completed Success from the Insideout serious,

16   transition job success - that was 8/15/05.  You

17   completed Business Principles and Management.

18   That's dated 8/15/04.  You have completed Great

19   Truths of the Bible, that's dated September 1,

20   2004.  You completed Successful Insideout

21   transition employment that's dated October 15,

22   2004.  You also completed Successful Parenting

23   Skills that's dated October 18, 2004.

24   Introduction to Business dated 12/9/04.  You

25   completed Handling Drugs course, 2/15/05.  There

26   is the legal assistance, paralegal, course you

27   completed March 15, 2005.  Economic Education

49

1    for the Consumer.   You completed that course

2    7/9/05; and then there is the Personal Integrity

3    Course completed August 1, 2005.   So you've been

4    pretty busy '04/'05 and I note that your last

5    hearing was May 19, 2004 and all of these

6    completed courses – all of this occurred after

7    the last hearing.

8            INMATE CONTRERAS: Yes.

9            DEPUTY COMMISSIONER MORRIS: Is there

10   anything else?   Did I miss anything there?

11           INMATE CONTRERAS: No.

12           DEPUTY COMMISSIONER MORRIS: Now I see

13   that you have – they've always talked about

14   AA/NA.   I have a chrono here the memorializes NA

15   or AA participation since 2001.   Are you still

16   participating in AA?

17           INMATE CONTRERAS: Yes.   I've been

18   participating in NA/AA since '95 actually, but

19   they gave me chronos from when I came to this

20   prison.

21           DEPUTY COMMISSIONER MORRIS: Have you

22   worked the 12 Steps?

23           INMATE CONTRERAS: Yes.

24           DEPUTY COMMISSIONER MORRIS: What's step

25   9?

26           INMATE CONTRERAS: We (indiscernible)

27   amendments to any people that are harmed

50

1   (inaudible).

2       **DEPUTY COMMISSIONER MORRIS:** What's 8?

3       **INMATE CONTRERAS:** We've made a list of

4   all the people we harmed and became willing to

5   make (inaudible).

6       **DEPUTY COMMISSIONER MORRIS:** That's good

7   enough, that's close enough and I think I heard

8   you say that you had written some letters to

9   your victim, without response.

10      **INMATE CONTRERAS:** Yes, without response.

11      **DEPUTY COMMISSIONER MORRIS:** And that's

12  normal.  So you've made an attempt to make

13  ammends.

14      **INMATE CONTRERAS:** Yes.

15      **DEPUTY COMMISSIONER MORRIS:** You

16  understand – can I assume then that you do

17  understand the importance of remaining drug

18  free?

19      **INMATE CONTRERAS:** Of course.

20      **DEPUTY COMMISSIONER MORRIS:** I'm impressed

21  with the fact that you don't have and CDC 115s,

22  particularly with your drug background, your

23  drug history.  Normally guys come into the

24  institution and they'll use some drugs, they'll

25  drink some wine or get into –

26      (End of Recording)

27      **DEPUTY COMMISSIONER MORRIS:** We're back on

51

1    record, and what I was asking you was how did

2    you manage to separate yourself from that

3    negative behavior?

4         **INMATE CONTRERAS:** After I came in here I

5    learned to see what was really valuable in life.

6    How my actions not only hurt me, but hurt my

7    family and the community itself.   Just – it

8    grows bigger then my own things.  By learning

9    that I had to stay away from all that, to not

10   hurt people, not hurt the people that I love

11   that I care, to hurt the community itself, and

12   that's how I managed to stay away.

13        **DEPUTY COMMISSIONER MORRIS:** Early on you

14   talked to the Commissioner about your crime

15   partners.  What were the ages of your crime

16   partners?  It was Robert Cruz – how old was

17   Robert?

18        **INMATE CONTRERAS:** Robert Cruz was not my

19   partner, that was one of the victim's friends.

20        **DEPUTY COMMISSIONER MORRIS:** That was one

21   of the victim's friends.

22        **INMATE CONTRERAS:** Yes.

23        **DEPUTY COMMISSIONER MORRIS:** How about

24   Sebastian Hernandez?

25        **INMATE CONTRERAS:** Sebastian Hernandez was

26   the victim itself.

27        **DEPUTY COMMISSIONER MORRIS:** How about

52

1  Oriano?

2          **INMATE CONTRERAS:** Oriano was my friend.

3          **DEPUTY COMMISSIONER MORRIS:** How old was

4  he?

5          **INMATE CONTRERAS:** He was, I believe,

6  nineteen.

7          **DEPUTY COMMISSIONER MORRIS:** Now I was

8  thinking that there was three people in your

9  car.

10          **INMATE CONTRERAS:** There were three people

11  in my car.  It was (Indiscernible) Oriano,

12  Moreno - Jose Moreno was the other individual.

13          **DEPUTY COMMISSIONER MORRIS:** How old was

14  Moreno?

15          **INMATE CONTRERAS:** Moreno was probably

16  twenty.

17          **DEPUTY COMMISSIONER MORRIS:** Oriano was

18  nineteen.

19          **INMATE CONTRERAS:** Yes, and there was

20  another individual, which I don't know who he

21  was - the (Indiscernible).

22          **DEPUTY COMMISSIONER MORRIS:**

23  (Indiscernible)?

24          **INMATE CONTRERAS:** He was also under

25  twenty-one.  And there was a girl named

26  (indiscernible) and she had to be probably like

27  seventeen or eighteen years old.

53

1        **DEPUTY COMMISSIONER MORRIS**: Okay, all

2    right.  I really misunderstood that.  I'm glad

3    you straightened me out on that.  And how old

4    were you at that time?

5        **INMATE CONTRERAS**: Twenty-four.

6        **DEPUTY COMMISSIONER MORRIS**: You were the

7    oldest?

8        **INMATE CONTRERAS**: Yes.

9        **DEPUTY COMMISSIONER MORRIS**: I'm asking

10    you that because you were talking about maturity

11    levels earlier.  Let me just ask you about

12    laudatory chronos.  I saw a number of laudatory

13    chronos.  I see three chronos dated 2005, all

14    having to do with AA participation.  I see four

15    chronos in 2004, all having to do with AA

16    participation.  You participated with regularity

17    and I'm impressed with the fact that you have

18    actively participated in that you have learned

19    something about the steps and you are actually

20    able to restate some of that stuff.  You've

21    implemented some of it.  You tried to work on

22    some it and that's good stuff.

23        **INMATE CONTRERAS**: Thank you.

24        **DEPUTY COMMISSIONER MORRIS**: Let me just

25    ask you about the psych report right quick.  I'm

26    looking at a psych report dated November 26 of

27    2003.  The report is authored by Joe Reed, Staff

54

1   Psychologist, Ph.D.  On page 2, last paragraph,
2   under current diagnostic impressions, under Axis
3   1 he's listed a poly-substance abuse in
4   sustained full remission in a controlled
5   environment; Axis 2, no contributory personality
6   disorder; Axis 3, hypertension.  On page 3,
7   under section 14, assessment of dangerousness,
8   I'm looking at section A, first paragraph and
9   about half-way through the second paragraph it
10  says that your risk for violent behavior within
11  a controlled setting is considered to be
12  average, relative to this level-two inmate
13  population.
14      "This conclusion is base upon several
15      factors.  On the one hand he has no record
16      of a significant juvenile criminal history.
17      Also, in this writer's opinion, he does not
18      appear to have a history of gang
19      affiliation.  However, he did have
20      friendships with gang members and appeared
21      to have been influenced by the gang
22      culture."
23      We've talked about that quite a bit
24  already.
25          **INMATE CONTRERAS:** Yes.
26          **DEPUTY COMMISSIONER MORRIS:** You were with
27  some folks who you yourself have identified as

55

1   active gang members, Eighteenth Street I

2   believe.

3        **INMATE CONTRERAS:** Yes.

4        **DEPUTY COMMISSIONER MORRIS:** And that's

5   how you got the association.  Let me say also

6   that I have reviewed the A12 and I also see that

7   the chrono generated by the investigative

8   lieutenant through the gang unit, and you are

9   not gang affiliated by institution standards

10   today.  So here again that tells me that you've

11   disassociated yourself from that population on

12   the yard and I'm more impressed with that

13   because I know the gang lieutenant has talked to

14   gang members on the yard and the gang members

15   have put you out as well – it sounds like.

16   That's what that means to me.

17        **INMATE CONTRERAS:** Also, under the

18   objection that I gave you on page

19   (indiscernible) –

20        **DEPUTY COMMISSIONER MORRIS:** I don't need

21   the page number just tell me what your objection

22   is.

23        **INMATE CONTRERAS:** The Detective Armenta,

24   that Crash Unit, she searched the computer

25   records to find out there was any paperwork

26   relating to me being a gang member and they

27   couldn't find nothing at all.

56

1          **DEPUTY COMMISSIONER MORRIS:** And I

2    understand that.   The gang lieutenant has

3    checked all those gang databases.   That's what

4    debriefing is all about, and I commend you for

5    that.

6          **INMATE CONTRERAS:** Thank you.

7          **DEPUTY COMMISSIONER MORRIS:** Now to

8    continue with the psych report.   I'm looking at

9    page 4, under - here again, assessment of

10   dangerousness, section B, he goes on to state

11   that if you are released to the community,

12   clinically assessed, he says, "This violence

13   potential is considered to be no higher then

14   that of the average citizen in the community if

15   he remains substance free."   Huge bar right

16   there.   That is particularly important given

17   your history.   Since you were thirteen years old

18   you've been involved in drugs and alcohol.   You

19   were under the influence at the time of the life

20   crime.

21          **INMATE CONTRERAS:** Yes.

22          **DEPUTY COMMISSIONER MORRIS:** Is that

23   correct?

24          **INMATE CONTRERAS:** Yes.

25          **DEPUTY COMMISSIONER MORRIS:** Under section

26   C, he goes on to say essentially what I just

27   said, that substance abuse is a significant

57

1    factor which can be a precursor to violence for

2    this individual.  Under 'Clinical Observations,

3    Comments, Recommendations' he wrote – he

4    continues to say, "This inmate is competent and

5    responsible for his behavior.  He has the

6    capacity to abide by institutional standards,

7    has largely done so during his incarceration."

8    That's evidenced by the being disciplinary free,

9    no 115s.

10           **INMATE CONTRERAS:** Thank you.

11           **DEPUTY COMMISSIONER MORRIS:** Even though

12    you've got one or two minor 128s.  Section 2,

13    "This inmate does not have a mental health

14    disorder which would assess to need treatment,

15    either during his incarceration period or upon

16    parole.  This inmate does appear to have a

17    significant substance abuse history and

18    continued participation, both within a drug

19    abuse program during his incarceration and as a

20    contingency for parole is suggested."  That's

21    signed off by Joe Reed, Ph.D.  You heard those

22    comments, do you have any objections or anything

23    you care to add to those statements?

24           **INMATE CONTRERAS:** As to that being in

25    institutional remission – drug remission – I

26    believe that is my choice not to use more drugs

27    ever. I don't need them.  I know what's

58

1    important now and I believe that I got too much

2    to lose to ever to decide to go down that road,

3    so that's about it.

4           **DEPUTY COMMISSIONER MORRIS:** I don't have

5    any further questions. I yield to the chair.

6           **PRESIDING COMMISSIONER PEREZ:** Thank you.

7    At this time I'd like to give the Deputy

8    District Attorney the opportunity to ask

9    questions through the chair.

10          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Yes,

11   if the panel would ask the inmate his state of

12   employment at the time of this crime.

13          **INMATE CONTRERAS:** I used to work the

14   Salvation Army store where we used to sell –

15   furniture store – and we used to sell a lot

16   furniture.  We used to sell large quantities of

17   refrigerators, stoves, and televisions.

18          **PRESIDING COMMISSIONER PEREZ:** You were

19   working there at the time of the offense?

20          **INMATE CONTRERAS:** Yes.

21          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** The

22   reason I ask that is that the probation report

23   indicates unemployed at the time of the report

24   anyway.  Would you ask him if he mentioned the

25   fight that he has described to the police, when

26   he was interviewed directly after the commission

27   of the crime?

59

1      **INMATE CONTRERAS:** I was interviewed and I

2 gave a tape statement as to what happened?

3      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** And

4 was a fight mentioned?

5      **INMATE CONTRERAS:** Yes.

6      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** The

7 indication I have is that no fight was mentioned

8 in any police report and it was not brought up

9 until the trial. Is that incorrect or correct?

10      **INMATE CONTRERAS:** I remember giving a

11 tape-recorded statement on December 13, 1989,

12 which I gave the statement that there was a

13 fight in progress when it happened.

14      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** And

15 if you would ask him, more particularly, the

16 location of the victim when the first shot was

17 fired?

18      **INMATE CONTRERAS:** He was standing

19 partially outside of the passenger side door of

20 the car.

21      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Was

22 it a two door or four door car?

23      **INMATE CONTRERAS:** I believe it was a two

24 door car.

25      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** That

26 was the first shot.  Where was he when the

27 second shot was fired?

60

1          **INMATE CONTRERAS:** He was still standing
2    right there.
3          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Did
4    you see what happened to him after you fired the
5    second shot?
6          **INMATE CONTRERAS:** He kind of went back
7    inside the car and we took off.
8          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** So
9    the last time you saw him he was back in the
10   backseat.
11         **INMATE CONTRERAS:** Yes.
12         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Did
13   you see where either shot hit the victim?
14         **INMATE CONTRERAS:** Excuse me?
15         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Did
16   you see where either shot hit or struck the
17   victim?
18         **INMATE CONTRERAS:** No I didn't.
19         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** I
20   have no further questions.
21         **PRESIDING COMMISSIONER PEREZ:** I have a
22   question sir.  What was the distance between
23   yourself and the victim when you shot?
24         **INMATE CONTRERAS:** Probably about from
25   here to where he's at.
26         **DEPUTY COMMISSIONER MORRIS:** What's that,
27   about eight feet?

61

1          **INMATE CONTRERAS:** Possibly about eight to
2    nine feet.

3          **PRESIDING COMMISSIONER PEREZ:** Both shots
4    he was hit in the abdomen, right?

5          **INMATE CONTRERAS:** Now I know that it was,
6    I didn't know at the time.

7          **PRESIDING COMMISSIONER PEREZ:** But you
8    know that now –

9          **INMATE CONTRERAS:** Yes.

10         **PRESIDING COMMISSIONER PEREZ:** From
11   reading all the documents from the trial, from
12   everything that occurred?

13         **INMATE CONTRERAS:** Yes.

14         **PRESIDING COMMISSIONER PEREZ:** Counsel,
15   questions for your client?

16         **ATTORNEY HURST:** No, I don't have questions.

17         **PRESIDING COMMISSIONER PEREZ:** Any
18   questions.

19         **DEPUTY COMMISSIONER MORRIS:** None.

20         **PRESIDING COMMISSIONER PEREZ:** Closing
21   statement please.

22         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Just
23   briefly, I have a difficult time – because there is no
24   autopsy report – and the panel just mentioned that the
25   victim was shot twice in the abdomen – I can't imagine
26   that someone standing at eight feet would shoot
27   someone in the stomach and think that the shot had

62

1    missed and that the person had not be shot.  I can't

2    imagine someone being shot in the abdomen and not

3    reacting in some way, causing the inmate to think that

4    it was necessary to fire another shot evidently at the

5    same location on the victim's body.  For that reason I

6    think the inmate needs a little more time to gain

7    insight into this crime.  He was given a sentence of

8    seventeen to life and he's been incarcerated for

9    twelve years as I understand it.  I just believe that

10   for this type of crime that he has served enough time.

11   Thank you.

12          **PRESIDING COMMISSIONER PEREZ:** Thank you,

13   counsel?

14          **ATTORNEY HURST:** Well, notwithstanding the

15   issue of time served I think he's suitable

16   today.  Mr. Contreras is working very hard to

17   make himself parolable and I think he has

18   clearly succeeded.  He was immature, as he said.  He

19   also lived in an area where violence was common,

20   certainly not uncommon.  Where gang activity was

21   prevalent and violence had intruded into his own life

22   three times through no fault of his own.  His criminal

23   history is very minimal, relates to license violations

24   and he now sees that he had an alcohol and drug

25   problem at that time and he's addressed that.  He's

26   enhanced his ability to function within the law

27   through just very excemplary programming.  He has not

63

1  had a 115.  He has a couple of very minor 128s, he's
2  upgraded educationally in that he has his GED at this
3  time.  The addendum that was submitted this morning
4  covers some self-help as well as some continuing
5  education, so he's continuing with some business
6  courses and things of that nature.  Vocationally –
7  you've been over all that – he has several trades,
8  auto mechanics, graphic arts, vocational computer
9  repair and he continues to program in that area in
10  that he's currently studying electronics.  He's been
11  extremely diligent about the AA and the NA
12  participation.  You find many continuous chronos over
13  the years, that he has been a very diligent
14  participant in that he's integrated those steps into
15  his own life.  He knows the steps, he's worked the
16  steps, he's provided to you some information that's
17  he's attempted to make amends, not only through his
18  letter writing but through the changes that he's made
19  in himself.  Other areas in which he's participated in
20  self-help – anger-management, parenting, Bible Studies
21  – I don't know that that was mentioned specifically.
22  The fatherhood program – he was a participant in a
23  lifer's group with Dr. Fishback.  I'm not certain of
24  the dates on that, but he's – if it's been available
25  basically he has done it.  He has taken advantage of
26  it.
27          His psych report is very positive and

64

1   supportive of parole and I know from time to time you

2   feel that you don't get very good psych reports - that

3   they tend to be somewhat superficial.  In this

4   particular case though, Dr. Reed does support his

5   conclusions.  He tells us what his reasoning was in

6   determining that Mr. Contreras no longer presents a

7   serious risk to society and; he spells that out very

8   clearly in section 14.  In addition to that he used

9   the two psychological assessments, the HCR 20 and the

10  (indiscernible) psychopothy checklist and neither of

11  those raised any read flags either.  In addition to

12  that he has a tremendous support system out there.  He

13  not only has a number of letters, but going over the

14  letters the quality of the support I think that he can

15  expect in the community from his family and from some

16  friends who have also written in is certainly going to

17  give him a leg up on many other individual who might

18  be considered for parole.  He has multiple job offers.

19  I think he has two very solid job offers.  He also has

20  suggestions that if he is deported to Mexico that he

21  would be able to work on a ranch. He has dual parole

22  plans.  He has received three letters, I think, from

23  Mexico.  Possibly more of them were, but this cousin

24  whose last name is Revas and he's indicated that he's

25  a dentist and is in a position to offer him some type

26  of employment, although it's not clear what.  He's

27  also received a letter from his aunt Maria Nevarro,

65

1   and that's a general support letter and a residential
2   offer, again, in Mexico.  The letter, which was a
3   little bit difficult, apparently, to interpret for us
4   today from his Uncle and I didn't quite get his name
5   but he is the one who owns a ranch and there is a job
6   offer contained in that.  There are also job offers
7   from his brother and letters from his niece, from his
8   sister, from both of his brothers, from his friend
9   Yolanda in Colorado; so he really has some excellent
10  support out there and I think that would make it much
11  easier for him to integrate into the community.
12        Now, I'd like to read one short passage from
13  the 2004 Board report because it kind of encapsulates
14  all of this material.  It is in the summary and this
15  was authored by – well, if I ever get to the end of it
16  I'll tell you.   Authored by Correctional Counselor
17  Karnazo.  "Considering the commitment offense, prior
18  record and prison adjustment, this writer feels
19  Contreras would pose a low degree of threat to the
20  public if released at this time."  Parenthetically I
21  realize that the counselors no longer make those
22  assessments.
23        "He has done well to take advantage of self-
24        help and therapy offer here at CTF and has picked
25        up many valuable skills in electronics as well as
26        computer repair.  Contreras has shown deep
27        remorse for his crime and matured greatly over

66

1          the years.  I have dealt with Contreras quite

2          extensively over the years and he has always

3          shown respect and patience in our dealings.

4          Housing unit staff said that Contreras is a model

5          inmate who has a good repoire with both staff and

6          inmates alike, stating actively involved in

7          therapy and self-help and remaining disciplinary

8          free shows that Contreras is concerned with

9          improving himself and has done well to set

10          himself up for a successful parole."

11          I think that is very true and he continues to

12   program very, very vigorously.  I would suggest to you

13   a matrix to the – and I think that translates to 216

14   months, eighteen years is the midterm, 216 months.

15   I'm not entirely certain of post-conviction.  I see

16   twelve plus or minus a few months, years of clean

17   time, so I would think it would be in the region of

18   forty-eight months post-conviction credit for a total

19   sentence of 168 months. I'm not taking into

20   consideration any pre-imprisonment incarceration.  He

21   has done that much time so this would be a case where

22   there is a couple of years – he would still be in

23   prison a couple of years, but that's really not the

24   point.  I think he deserves the finding of suitability

25   today because he's really worked for it and I think

26   this is a very good person today.  Thank you.

27          **PRESIDING COMMISSIONER PEREZ:** Thank you.  Sir,

67

1   this is your opportunity to provide a statement
2   regarding why you fell that you are suitable for
3   parole.
4           **INMATE CONTRERAS:** My counsel made a statement
5   as to the time.  I've been arrested since 1989, making
6   it sixteen years not twelve.  I came in the
7   institution in '93, but it took four years for them to
8   take me to court, but it was four years that I was
9   already incarcerated.  As to why I believe I'm
10  suitable, I'm a different person then I was back then.
11  I have learned my lesson. I wish this never had
12  happened.  I feel very sorry for the individual.  The
13  DA made the statement that he believes (indiscernible)
14  standing still.  If I would have known, or if I would
15  have believed it, that he was (inaudible) I would not
16  have done it.  I could stand here and say, with honest
17  truth, that I would not have shot the individual if I
18  had thought that his life was in danger.  Yes, I
19  didn't make an assessment as to the whole thing and
20  apart from that I know that this will never happen
21  again. I've got too much to loose.  I care for my
22  family greatly.  I care for people.  I'm learning how
23  to be a better person.  I'm trying to work to stop
24  people from doing the same mistakes that I did.  So,
25  with that in mind, I believe that I would be an asset
26  to the community if I were to go out because I know
27  how to talk to individuals so they will not make the

68

1    same mistake I made.  And that will be it.

2          **PRESIDING COMMISSIONER PEREZ:** Thank you sir.

3    We will now recess for deliberations. The time is 9:54

4    A.M.

5                    **R E C E S S**

6                      --oOo—

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

69

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER PEREZ:** Sir, the

4    panel has reviewed all the information received

5    from the public and relied on the following

6    circumstances in concluding that you are not

7    suitable for parole and would pose an

8    unreasonable risk of danger to society, or a

9    threat to public safety if released from prison

10   at this time.

11          Sir, one of the factors that we took into

12   consideration is the gravity of the offense in

13   that it is the opinion of the panel that the

14   offense was carried out in an especially cruel

15   and callous manner in that the victim was shot

16   twice in the abdomen as he fought with another

17   individual who had accompanied you to the

18   7Eleven store where you were to purchase

19   alcoholic beverages for yourself as well as

20   other individuals.  The offense was carried out

21   in a dispassionate manner in that the record

22   reflects that you, upon observing the

23   altercation, you went to you vehicle, you

24   retrieved a loaded handgun, which you kept in

25   your vehicle and you proceeded to use it

26   resulting in the victim's demise.  The motive

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 1 12/14/05**

1  for this crime was very trivial in relationship

2  to the offense in that it was a gang-related

3  incident which resulted in a physical

4  altercation between two individuals.  Somebody

5  that was with you and somebody else of which you

6  were not a part of until you came out of a 7

7  Eleven store.

8          Furthermore sir, this crime created the

9  potential for other victims in that it occurred

10 in a parking lot at the 7 Eleven.  A stray

11 bullet could have just as easily hit another

12 individual had you missed the victim.  These

13 conclusions are drawn from the statement of

14 facts where according to the record sir, n the

15 December 9, 1989 you drove to the 7 Eleven to

16 purchase beer in the company of other

17 individuals, of which some were gang members.

18 At some point you went into the 7 Eleven store

19 to purchase the beer.  There was a physical

20 altercation involving an individual in your

21 vehicle and another individual in another

22 vehicle, gang-related type altercation.  The

23 record reflects that when you came out of the

24 vehicle you observed this altercation in that

25 one of the individuals that was with you, and

26 who was involved in the fight, had been hit and

27 **SAMUEL CONTRERAS H-70748 DECISION PAGE 2 12/14/05**

71

1    was bleeding.  The record reflects that you then

2    went to your vehicle to retrieve a gun from your

3    car and shot Hernandez twice in the abdomen,

4    resulting in his demise.

5         Sir, the other factor that we did take

6    into consideration is that at the time of the

7    commitment offense you were approximately 24/25

8    years old; and by that point you had established

9    an unstable social history and prior criminality

10   which includes arrests and/or convictions for a

11   variety of vehicle code violations.

12   Specifically reckless driving, driving with a

13   suspended license and driving without a valid

14   license.  Furthermore sir, the record reflects

15   that you have a history of using elicit

16   substances beginning at a very young age.

17   Specifically cocaine, PCP, marijuana, Black

18   Beauties and alcohol to excess.

19        Sir, we do note for the record that the

20   most recent psychological report is supportive

21   of release.  This report was prepared by staff

22   psychologist Joe Reed, R-E-E-D, dated November

23   26, 2003, in which he indicates that "if

24   released to the community, clinically assessed,

25   his violence potential is considered to be no

26   higher then that of the average citizen of the

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 3 12/14/05**

72

1    community if he remains substance abuse free.

2         Sir, the hearing panel notes that you

3    have been convicted of murder-second and as such

4    it would not be reasonable to expect that you

5    would be granted parole during the next two

6    years.  So as a result, we are going to deny you

7    for two years.  Again, one of the man factors is

8    the gravity of the offense in that it is the

9    opinion of this panel that the offense was

10   carried out in an especially cruel and callous

11   manner in that the victim was shot twice in the

12   abdomen as he fought with another individual who

13   accompanied you to the 7 Eleven store where you

14   were to purchase alcohol for yourself as well as

15   minors who were at a party that you had been at.

16   The offense was carried out in a dispassionate

17   and calculated manner in that the record

18   reflects that upon observing the altercation

19   after you came out of the 7 Eleven store you

20   immediately went to your vehicle where you

21   retrieved your loaded weapon and proceeded to

22   use it by shooting the victim twice in the

23   abdomen resulting in his demise.  The motive for

24   this crime was very trivial in relation to the

25   offense in that it was gang-related incident

26   which resulted in a physical altercation that

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 4 12/14/05**

74

1    group opened the car door of the other vehicle and

2    began arguing and fighting with the victim.   The

3    record reflects that there was testimony that someone

4    in the victim's vehicle hit one of your friends in the

5    head with a bottle and as a result your friend was

6    bleeding.   The record indicates that you witnessed the

7    altercation when you came out of the 7 Eleven.   You

8    retrieved your loaded weapon from your vehicle and

9    shot the victim in the abdomen twice, resulting in his

10   demise.

11        Again sir, the other factor that we did take

12   into consideration is that you had an unstable social

13   history and prior criminality, which includes the

14   excessive use of drugs specifically cocaine as well as

15   use of other substances to include PCP, marijuana and

16   Black Beauties, as well as the use of alcohol to

17   excess starting at a younger age.

18        We do note for the record that you did have a

19   criminal history prior to the commitment offense

20   consisting of arrests and/or convictions for vehicle

21   code violations, specifically reckless driving,

22   driving without a suspended license and driving

23   without a valid license.

24        Sir, in terms of your parole plans we note for

25   the record that you have very good parole plans.

26   Although it's unclear what some of the job − what

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 6 12/14/05**

75

1    specifically you would be doing in terms of

2    employment.  You indicated that you had job offers

3    with a number of individuals.  We do note for the

4    record that you do have residence and employment plans

5    in Mexico and you have residence and employment plans

6    in California as well.  We do note that in addition to

7    that you have a number of skills that you be able to

8    utilize to obtain employment upon your release to

9    parole.  You've done very, very well in terms of

10   completing vocations since you've been incarcerated,

11   very, very well.  We see a lot of individuals that

12   come before this panel that have been in prison longer

13   then you and have not completed one vocation and you

14   have a variety of vocations that you've completed and

15   you must be commended sir.  Specifically, in auto

16   mechanics, graphic arts, paralegal, electrician

17   technician, just to name a few, all vocations and

18   trades that would enable you to obtain employment were

19   you to be released to parole.

20        Sir, the hearing panel notes that responses to

21   Penal Code Section 3042 indicate an opposition to a

22   finding of suitability by the District Attorney of Los

23   Angeles County.  Sir the panel makes the following

24   findings, and I want you to listen very closely to

25   what I'm saying, okay?  One of the factors that we

26   took into consideration whether or not the panel

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 7 12/14/05**

76

1  believes that you accept full responsibility for the

2  crime.  Accepting full responsibility for a crime does

3  not just entail saying I take full responsibility.

4  Full responsibility is demonstrated, to some extent,

5  by some of your responses to us today.  this panel,

6  both Deputy Commissioner Morris and myself, feel that

7  you have not been totally forthright with us regarding

8  your culpability in that you tend to minimize your

9  role by implying – actually not implying, you actually

10  came out and said that your intent was simply to stop

11  this individual, the victim in this case, and not to

12  harm him.  It is difficult to believe that at the

13  proximity that you were at, between yourself and the

14  victim, it is difficult to believe that you didn't

15  know where that first shot hit, and that there was no

16  reaction from the victim when you shot him, at that

17  proximity, in the stomach which necessitated in your

18  mind based on what you told us today, to shoot him a

19  second time.  When you sit here and tell us, "I didn't

20  mean to harm him. I shot him twice, but I didn't mean

21  to harm him," that doesn't make any sense.  When you

22  pointed that weapon at that individual you made a

23  choice to harm him.  You made a choice to harm him, so

24  it's difficult to understand how logically you can

25  believe that I didn't mean to harm him when I pointed

26  a loaded weapon at him and shot him twice.  It tells

27  **SAMUEL CONTRERAS H-70748 DECISION PAGE 8 12/14/05**

1    that maybe you're – that you're telling us you take

2    full responsibility, you are trying to kind of

3    minimize it and try to make excuses for why – I didn't

4    really mean to hurt him I just wanted to stop him.

5    When twice you hit him in the stomach.  The other

6    thing – I want you to be very aware of this sir  – and

7    I speak for myself as well as Deputy Commissioner

8    Morris, you tend to minimize or make excuses for why

9    you committed this crime.  When I asked you why you

10   committed this crime you talked about you were

11   immature, your dad, your brother and yourself had

12   previously been stabbed and as a result, because of

13   all those things in your background, you reacted the

14   way you did.  Those are excuses in my view.  Those are

15   crutches in my view and the view of Deputy

16   Commissioner Morris, that you are trying to use to

17   minimize or may excuse why you reacted the way you

18   did.  When I asked you about your drug use and why you

19   were using drugs, I got low self-esteem, I was self-

20   medicating, I had no education – excuses.  Instead of

21   taking responsibility I tried drugs, I gave it a shot,

22   I used it with peers, I enjoyed it – whatever the case

23   may be, but what I'm getting from you is excuses.  Why

24   do you use drugs?  You're self-medicating, you have

25   low self-esteem, no education.  There are a lot of

26   people out there with low self-esteem and no education

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 9 12/14/05**

78

1    that are not out committing crimes or using drugs.

2    So, those tend to be excuses that in my view they

3    sound like they are excuses, okay?  So I think you

4    need to go back, you need to look at the transcript,

5    you need to go over some of the areas that we

6    discussed today, whether or not you agree with it, I

7    want you to know that when you walk out that door what

8    we saw from this side of the table, okay?  If we're

9    seeing that, then more likely then not - if you get

10   future panels and you - and you come out and say some

11   of the things you said today, they might think the

12   same thing we do.  They may or may not tell you - come

13   out and tell you the way we're telling you right now,

14   but they are probably going to think that to some

15   extent you are making excuses.  It's really apparent

16   sir - I'll be very frank with you that you learned the

17   lingo within the institutions.  You learned the right

18   things to say when you come before these panels.  Just

19   because you learned all the lingo and the psycho

20   mumbo-jumbo doesn't mean that this panel is going to

21   sit here and just oh, these are all the reasons he did

22   it, oh, look at these things in his background that

23   caused him to do it, we are just not going to fall for

24   it, sir.  You are a very intelligent man.  It is

25   obvious you are a very intelligent man from some of

26   the work that you have done here today.  I want you

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 10 12/14/05**

1    to be fully aware when you walk out that door what we

2    have taken into consideration in denying you, and this

3    is one factor that we took into consideration.  One

4    factor that you have control over and for future

5    hearings.  Do you understand, sir?

6              INMATE CONTRERAS: Yes.

7              PRESIDING COMMISSIONER PEREZ: Nevertheless, sir,

8    we would like to take this opportunity to commend you

9    for a number of things.  First of all, let me say, do

10   not be discouraged, do not be discouraged.  If we

11   truly felt that within a year you would be ready, we

12   would have given you one. We believe that two is most

13   reasonable.  It makes no sense for us to give you a

14   one-year denial if we do not feel in one year you

15   would be suitable.  We believe two is reasonable,

16   that's why we are giving you two years.  It makes no

17   sense to deny you for one year when more likely than

18   not, it is our opinion that you won't be found

19   suitable again.  You don't need to come back again

20   just to be found unsuitable again, especially when we

21   feel two years is reasonable.  You are doing very well

22   within the institutions, you have no 115's, that is

23   phenomenal, I am always very impressed with anybody

24   that can spend as much time as you have behind these

25   walls with no 115's.  That is very impressive.  That

26   says a lot about your ability to get along with people

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 11 12/14/05**

1    and really maneuver through these shark-infested

2    waters quite frankly, okay?  I am sure you know

3    exactly what I am talking about.  We are very very

4    impressed with everything that you have accomplished.

5    You have completed auto mechanics, graphic arts,

6    computers, paralegal, electrical technician.  You have

7    (inaudible) self-help programs that you have taken,

8    that you have been very proactive in participating and

9    completing. That certainly is very commendable.  You

10   are on the right track.  You keep doing what you are

11   doing in the institutions, and you will eventually be

12   found paroled, there is no doubt in my mind.  You will

13   eventually be found paroled.  I want you, again, I

14   want you to really listen and take into consideration

15   what I discussed with you specifically at the end in

16   regards to what this panel saw because we both saw it,

17   we both saw it.  Again, before you come before this

18   Board the next time around, take that transcript out

19   and specifically go over some of your responses you've

20   given us today and some of the concerns that we have

21   expressed as a result of some of those responses.

22   Does that make sense, sir?

23          **INMATE CONTRERAS:** Yes.

24          **PRESIDING COMMISSIONER PEREZ:** We do - again,

25   you are doing very well, don't become discouraged

26   because you are doing very well.  Commissioner Morris?

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 12 12/14/05**

81

1          **DEPUTY COMMISSIONER MORRIS:** I concur with the

2     Chair completely, totally.  There is a little bit of

3     discomfort in my mind as it relates to risk level

4     because of the reasons as stated.  Okay?  Separate and

5     apart from that - included in that stuff has to do

6     with that turf gang stuff too.  I am absolutely

7     pleased with the way you separated yourself from that.

8     You have gone the extra step to do the paperwork so

9     that you have in fact a paper trail showing that you

10    actively done what you need to do to divorce yourself

11    from that. You've done a good job.  You have certainly

12    learned how to function in the institution.  I don't

13    want to beat you up for that, I commend you for

14    learning and paying attention.  However, you are not

15    there yet.  You are absolutely on the right course,

16    and I implore you stay the course.  Do not be

17    discouraged, you are absolutely on track, do you

18    understand?

19          **INMATE CONTRERAS:** Yes.

20          **DEPUTY COMMISSIONER MORRIS:** You have got to

21    keep doing this good stuff.  Okay.  Deal with some of

22    that life crime stuff as well.  Overhaul some of that

23    stuff in your mind, and you will be comfortable with

24    it.  I yield to the Chair.

25          PRESIDIING COMMISSIONER PEREZ: Thank you, sir.

26    We do wish you the best of luck. This concludes this

27    **SAMUEL CONTRERAS H-70748 DECISION PAGE 13 12/14/05**

82

1   hearing.   The time is 10:35 A.M.

2                        --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED FOR TWO YEARS.**

24   **THIS DECISION WILL BE FINAL ON: <u>Apr. 13, 2006</u>**

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **SAMUEL CONTRERAS H-70748 DECISION PAGE 14 12/14/05**

83

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, Rheanna Bernard, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 82, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF SAMUEL
CONTRERAS, CDC #H-70748, ON DECEMBER 14, 2005, and
that the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned tape
to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated JANUARY 4, 2005, at Sacramento,
California.


RHEANNA C. BERNARD
TRANSCRIBER
**PETERS SHORTHAND REPORTING**