1   Samuel Contreras
    CDC # H-70748
2   P.O. Box 689/F-119-L
    Soledad, CA 939 40
3

4   In Pro Se

5

6

7

8               UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11

12   In re:                Case No. C 07-3611 JF (PR)

13      SAMUEL R. CONTRERAS      PETITIONER'S TRAVERSE TO
                            RESPONDENT'S RETURN; POINTS AND
14   on habeas corpus.     /   AUTHORITIES/EXHIBITS THEREON

15

16

17                 POINTS AND AUTHORITIES

18                     Issue One

19     **PETITIONER HAS A LIBERTY INTEREST IN PAROLE.**

20       The crucial issue on appeal is whether a federal habeas court may

21   remedy a federal constitutional violation by a state agency; here a decision

22   to deny parole absent a scintilla of evidence that Petitioner's parole

23   would CURRENTLY pose an "unreasonable risk of danger to public safety."

24       Petitioner has a liberty interest in parole that is protected by the

25   Due Process Clause. Sass v. B.P.T. (9th Cir. 2006) 461 F.3d 1123, 1129;

26   Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 662; Biggs v. Terhune (9th

27   Cir. 2003) 334 F.3d 910, 915; McQuillion v. Duncan (9th Cir. 2002) 306

28   F.3d 895, 904; In re Rosenkrantz (2002) 29 C.4th 616, 626.

1    As the above-noted decisions declare, there is no longer any question

2    albeit Respondents continue to deny this well-settled area of law.

3    Petitioner submits that their long-held position is unavailing and benign.

4

5                                    Issue Two

6    THE SOME EVIDENCE STANDARD DOES NOT APPLY TO PETITIONER.

7    Respecting the Circuit Court's previous holdings, Petitioner

8    respectfully agrees with Respondents that the "some evidence" standard

9    of review is appropriate to prison disciplinary matters but an inappropriate

10   standard to apply to these issues. Thus, it is reasonable to encourage

11   this Court to revisit the standard.

12   Evolving from Superintendent v. Hill (1985) 472 U.S. 445, 455; and

13   first applied to a parole matter in In re Powell (1988) 45 C.3d 894, 904,

14   the High Court used the some evidence test to review a prison discipline

15   matter where charges were based on a confidential source. The Court held

16   the prison's need for security and confidentiality diminished the due pro-

17   cess involved. Petitioner's due process is not reduced therefrom because

18   neither a parole determination process nor adjudications of his habeas

19   claims required disclosure of confidential sources and involved no security

20   concern sufficient to lessen its liberty impact.

21   State courts that adapted Hill's some evidence standard of parole

22   decision review held that prisoners didn't have a liberty interest but

23   have since largely applied the previous cites statewide. Because the liberty

24   interest is now well-established, due process commands a finding of some-

25   thing more weighty than "some" (or any?) evidence reliably in the Record

26   to insure and incorporate a vested liberty right protected by the Due Pro-

27   cess Clause of the Constitution's Fourteenth Amendment.

28

                                    -2-

1    One could arguably assert that no other state whose parole statutes

2 provide a protected liberty interest allow it to be extinguished by the

3 mere hint of any evidence whether reliable, relevant or ethereal. In con-

4 trast, Minnesota's Supreme Court recently held in Carrillo v. Fabian (2005)

5 701 N.W.2d 763, that Hill's some evidence standard for parole disciplinary

6 matters is inapposite to review an agency's decision affecting an inmate's

7 parole release date where state statutes provide a protected liberty inter-

8 est. Based on the tripartite test prescribed by Hill, the Court there held

9 the "substantial evidence" standard of review protects due process.

10    In Santosky v. Kramer (1982) 455 U.S. 747, the Court explained:

11    "This court has mandated an intermediate standard of proof--'clear
      and convincing evidence'--when individual interests at stake in a
12    state proceeding are both 'particularly important' and 'more
      substantial than mere loss of money.' Addington v. TX (1979) 441
13    U.S. 418, 424. ... the court has deemed this level of certainty
      necessary to preserve fundamental fairness in a variety of
14    government-initiated proceedings that threaten the individual involved
      with 'a significant deprivation of liberty' or 'stigma.' ¶ The extent
15    to which procedural due process must be afforded [to] the recipient
      is influenced by the extent to which he may be 'condemned to suffer
16    grievous loss.' Goldberg v. Kelly (1970) 397 U.S. 254, 262-63;
      Joint Anti-Fascist Refugee Committee v. McGrath (1951) 341 U.S. 123
17    (Frankfurter, J., conc.). Santosky, supra, at pp. 756, 758.

18    There can be no challenge to the premise that Petitioner's interests

19 at stake here aren't "particularly important" nor don't involve "a signifi-

20 cant deprivation of liberty--or a grievous loss." (Compare: Davis v. B.P.T.

21 (2005) 200 Or.App. 366, 371-373 ["clear and convincing evidence" required

22 in parole cases]; Trantino v. N.J. State Bd. (2001) 764 A.2d 940, 976

23 ["substantial evidence" required]. Of significance is the fact that when

24 reviewing decisions of state agencies for evidentiary support, California's

25 statutory law mandates courts to apply the substantial evidence test. CA

26 Civ.Code §1094.5(c). This Court should set forth why civil law grants such

27 deference without including liberty interests as well.

28

Issue Three

PETITIONER HAS NOT RECEIVED MEANINGFUL CONSIDERATION AND
PAROLE STATUTES AS APPLIED VIOLATE DUE PROCESS AND EQUAL PROTECTION.

The Second District, Div. 7, located in L.A., recently held that:

(1) factors unrelated to commitment offense did not provide "some evidence" of unreasonable risk of danger to public;

(2) nature of prisoner's offense did not supply some evidence of unreasonable risk of danger to public; and

(3) any predictive value of commitment offense dissipated over time.

In re Lawrence (2007) 59 C.Rptr.3d 537. They noted there that state courts are not bound by the AEDPA, state courts are free to apply what they discern to the proper interpretation of federal due process standards .... Id. 59 C.Rptr.3d at pp. 557-558. The Sixth District in San Jose found that:
[to lawfully deny parole "t]he evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. In re Tripp (2007) 58 C.Rptr.3d 64; (citing Rosenkrantz, supra, p. 665; conc. In re Lee (2007) 49 C.Rptr.3d 931. It violates a prisoner's right to due process when the board or governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. E.g., In re de Luna (2005) 24 C.Rptr.3d 643 [Board concluded, contrary to psychological evaluations, that inmate needed more therapy, ...]; In re Scott (2005, Scott II) 34 C.Rptr.3d 905 [governor was wrong about inmate's history of violent crime and the nature of the commitment offense]; Lee, supra, [Governor overstated seriousness of commitment offense and wrongly faulted inmate for late acceptance of responsibility].") In re Tripp at p. 68.

In what can only be described as an "omnibus ruling", the First District in San Francisco held that 1) "some evidence" did not support a finding that release on parole would unreasonably endanger public safety; and 2) reliance on circumstances no more aggravated or violent than the minimum necessary to sustain convictions violated due process. In re Barker (2007) 59 C.Rptr.3d 746. This TRIPLE murder conviction was not sufficient for the BPH to deny parole suitability and the reasoned court noted:

"In denying [petitioner]'s habeas corpus petition, the superior court did not conduct an evidentiary hearing. 'This is therefore an original proceeding in which we independently review the record.'In re Scott

-4-

(2004) (Scott I); 119 C.App.4th 871, 884; Id., p. 759.

Then, discussing the deferential "some evidence" review standard, Judge Richman in Footnote 16, makes an interesting aside which is both instructive and prescient in these proceedings:

"The A.G. inexplicably argues that Barker does not have a liberty interest in parole and thus the BPH's decision should not be reviewed under the "some evidence" standard. Our Supreme Court has made it very clear that 'prisoners possess a protected liberty interest in connection with parole decisions rendered by the BPH,' and that imposition of 'a standard of review less stringent than the "some evidence" test would permit the BPH to render a decision without any basis in fact' which 'would be arbitrary and capricious, thereby depriving the prisoner of due process of law.' (US Const. Amnd. 14, (citing Rosenkrantz, supra, pp. 657, 661.) This holding of Rosenkrantz was cited and confirmed in In re Elkins (2006) 144 C.App.4th 475, 488, which was filed ... 3 weeks before the [A.G.'s] return here was signed and filed." Ibid. p. 760, (footnote 16).

Returning to the L.A. court case of Lawrence, after outlining the 3 societal goals of imprisonment: 1) retribution; 2) deterrence; and 3) incapacitation, Judge Johnson found:

"California's sentencing structure in murder cases makes it clear the denial can only be justified by the third of these purposes ... Unless there is an unreasonable risk of parole applicant will re-offend and thus pose a risk to public safety she or he is to be released on parole. Id. p. 559 (Emphasis added.)

Just prior to this directive, the Judge observed that the Ninth Circuit and California Supreme Court articulated that:

"the commitment crime can lack the power to supply "some evidence" supporting a denial of parole because of the interplay of 2 factors--the nature of that crime and the passage of time since its commitment. That is, the fact there is "some evidence" the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the public safety at the present time." Id. p. 558.

Summing up what is really at issue here, the Lawrence court neatly sewed up the various pieces of the "suitability puzzle":

"We conclude the Governor's reversal of the Board's decision is therefore not supported by some evidence.

¶"The Legislature has made this abundantly clear in [PC §§ 3041, (a) & (b)] which provide the Board 'shall normally set a parole release date ... that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public'. ... As the California Supreme Court emphasized in In re Dannenberg (2005) 34 C.4th 1061, 1098, a prisoner can be found unsuitable for parole only when there is 'some evidence' ... [suggesting] he remains a danger to public safety." Lawrence, supra, at pp. 563-64.

Issue Four

RESPONDENTS DO NOT SHOW, BY THEIR OWN EXPERTS, THAT PETITIONER IS A CURRENT THREAT AND THE IRON'S MINIMUM SENTENCE HAS LONG SINCE PASSED.

A.    THE COURT'S DECISION IN IRONS SUPPORTS PETITIONER

    1.    The 9th Circuit's Irons Decision Is On Point.

Irons, the 9th Circuit's THIRD parole analysis after Biggs and Sass, supra, addressed the issue of whether, when deciding suitability and con-sistent with due process, the immutable facts of the conviction may be employed repeatedly (and interminably?), to preclude those like Petitioner who unarguably satisfies all parole requirements, are forensically evaluated repeatedly to pose no parole risk, and has served in excess of the appropriate and/or maximum sentence imposed for an offense based on the facts of their conviction.

The 9th Circuit held that the BPH's use of Iron's crime, a particularly brutal murder, BEFORE he had served the mimimum prison sentence imposed by the trial court, satisfied the "some evidence" test sufficiently to uphold the BPH's decision finding he was unsuitable for release. They focused on Iron's egregious murder, specifically reciting the facts, and recognizing the nature of the crime. Irons received the same sentence as Petitioner. By the time this matter is decided Petitioner will have served over eleven years more than that prescribed for his conviction according to the decision in Irons.

1   The Court emphasized that <u>Irons</u>, like <u>Biggs</u> and <u>Sass</u> before him, had
2   not served the "minimum number of years to which they had been sentenced
3   at the time of the challenged denial by the Board." They explained, contrary
4   to the Board's position, why <u>Biggs</u> was **not** overturned by <u>Sass</u>, and
5   re-emphasized that <u>continued use of the commitment offense facts to find</u>
6   <u>such an inmate unsuitable for parole may constitute a Due Process violation</u>
7   <u>AFTER THE MINIMUM TERM HAS BEEN SERVED</u>:

8   "... We note that in all cases in which we have held that a parole
    board's decision to deem a prisoner unsuitable for parole solely on
9   the basis of his commitment offense comports with due process, the
    decision was made before the inmate had served the minimum number
10  of years required by his sentence. Specifically, in <u>Biggs</u>, <u>Sass</u>,
    and here, the petitioners had not served the minimum number of years
11  to which they had been sentenced at the time of the challenged parole
    denial by the Board. [] All we held in those cases and all we hold
12  today, therefore, is that, given the particular circumstances of the
    offenses in these cases, due process was not violated when these
13  prisoners were deemed unsuitable for parole **prior to the expiration
    of their minimum terms.** <u>Irons</u> at pp. 664-65, (emphasis added.)

14

15       **2.   Petitioner Has Been Denied Due Process Under Irons.**

16   Under the <u>Irons</u> standard, at the time of Petitioner's <u>4th</u> subsequent
17  parole hearing in 20<u>05</u>, he had served (including jail time and credits)
18  <u>sixteen</u>    (<u>16</u>) years in prison, <u>4</u> **more years** <u>than the minimum sentence</u>
19  <u>imposed by the trial court.</u> Petitioner calculated that when <u>5</u> years and
20  <u>4</u> months post-conviction credit is deducted (per 15 CCR § 2410, at 4
21  months for eligible disciplinary-free years), he had credit for <u>twenty-one</u>
22  years, <u>four</u> months (<u>21</u>+<u>1/3</u>) of confinement at the time of the Hearing.
23  The Board has never disputed these facts. Notably, this District has
24  recently made a similar ruling and has embodied the <u>Irons</u> holding that
25  bears repeating here with the Court's leave:

26  "Another critical difference between this case and <u>Biggs</u>, <u>Sass</u>, and
    <u>Irons</u> is that [petitioner] had served a substantial amount of time
27  beyond his minimum sentence. This court must consider that at some

28

point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. Irons, supra at p. 665. A decision to revoke parole based solely on an inmate's commit- ment offense that can no longer be considered probative of danger- ousness to society would be arbitrary and not comport with the "some evidence" standard. Hill, supra at pp. 445-55, 557. This is one of those cases ... .

"Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not. .... (Emphasis added).

"The state court's determination that the [Board's] sole reliance on [petitioner's] commitment offense satisfied the 'some evidence' standard was an objectively unreasonable application of Hill. See 28 U.S.C. §2254(d). Brown is entitled to federal habeas relief on his due process claim." Brown v. Kane, 2007 WL 288488 at *6-7 (N.D. Cal. 2007), opinion of Honorable Charles R. Breyer.

See Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049; Martin v. Marshall

(N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143;

(N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143;

Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1083-1087.

Of significance is the fact that at the time of Petitioner's 2005 Hearing, he had served substantially more time in prison than the maximum prison term prescribed by the BPH's Regulations for the particular facts of his second degree murder. His prison term at that point was beyond the range prescribed for deliberative premeditated FIRST degree murder. Nevermind his acquittal. This was substantially exceeding the prison terms served by numerous condemned first degree murderers who served sentences of death based on special circumstances but whose sentences were overturned on appeal and reduced to Life when the state's death penalty statute was held unconstitutional. Many of them paroled long ago.

"Although I agree that evidence of premeditation and deliberation supports the conclusion that petitioner's crime was particularly egregious for a second degree murder, it is another matter whether any evidence would support the same conclusion for a first degree murder. Other than felony murders, first degree murders by definition involve premeditation and deliberation. Moreover, there was sufficient

doubt whether premediation and deliberation existed to persuade a jury to acquit petitioner of first degree murder ... . Rosenkrantz, supra, at p. 689, (dissenting Opinion.)

### 3. Petitioner Is NOT A Current Risk To Public Safety.

At this point, according to the California Supreme Court, the continued use of the facts of Petitioner's second degree murder commitment offense to preclude his parole violated Due Process:

"The significance of the above observations is this:

there will come a point, which may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense." Rosenkrantz, supra, at pp. 689-90, Moreno, J. disntg., (emphasis added.)

Judge Richland has seen the expert's conclusions for what they are:

"These conclusions, of course, are the opinions of trained experts, all of whom said [petitioner] did not need therapy. We are troubled therefore by a contrary finding, especially in light of the uncontradicted evidence in the record. And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record—and despite repeated ciriticisms from the courts. The harsh criticism by Division Three of this court in In re Ramirez (2001) 94 C.App.4th 549, disapproved on another ground in Dannenberg, supra, at pp. 1086-87, is illustrative. (Barker, p. 761.)

Respondents discredit the Circuit Court's reasoning in Irons, relying on Rosenkrantz and Dannenberg to submit that Irons countermands the BPH's statutory directive to continue to consider the gravity of the commitment offense to deny suitability, even after the maximum term for the offense has possibly even doubled the mandatory minimum. Petitioner's attached Exhibit "A" is so directly on point as to be astounding.

There are several flaws in the BPH's position. It misuses the definition of the words "minimum terms." Indeterminately sentenced inmates must be granted parole at the first or initial Hearing. If public safety

1   requires a more lengthy TERM based on forensic/professional opinion(s),

2   the inmate "shall" receive a term setting at the next or subsequent meeting.

3        Next, when denying parole, it is their duty to instruct the inmate

4   as to not only why he is being denied a parole term and for how long, but

5   they are to set meaningful guidelines and expectations that will encourage

6   the inmate to work towards becoming suitable through available self-help

7   and education, as well as participation in work, healthy activities, and

8   therapy or counseling if needed to comply with the risk to public safety.

9        Lastly, the BPH is to provide the inmate with all relevant paperwork

10  prior to the Hearing, to secure counsel and an interpreter if requested,

11  and to have professional opinions submitted upon which they can base their

12  term setting, decided upon the "overarching consideration" (see: Barker,

13  supra, p. 753), per decisional law and statutory authority.

14       Further, if the BPH disagrees with the Irons calculation when

15  designating the "minimum term", it is doubtful that they disagree that

16  the Court there failed to include any parole "term-reduction credits" per

17  CCR Title 15, Div. II, § 2410, (McQuillion, supra, p. 898.)

18       Honorable Judge M.H. Patel, of this Court, has held that even the

19  second degree murder of one's own child and a coverup involving disposing

20  of the child is not sufficient, in the face of positive psychological

21  opinions, positive programming, and the remoteness of time after showing

22  remorse and rehabilitation. After a thoughtful and careful reading and

23  a review of the record before the panel, who again refused to adhere to

24  statute and decisional precedent, she made the following conclusions in

25  Willis v. Kane N.D. Cal. 2007) 485 F.Supp.2d 1126:

26  "A California prisoner with a sentence of a term of years to life with
    the possibility of parole has a protected liberty interest in release
27  on parole and therefore a right to due process in the parole suitability

28

proceedings. See Sass [supra], at [pp.] 1127-28; [PC] § 3041(b), ¶ "The
same evidence standard provides protection against more than fabricated
charges or bureaucratic mistakes--the some evidence standard also
protects against arbitrary decisions. [Hill, supra], at [pp.] 454-55,
457. ... ¶ "Under these circumstances, the BPH's reliance on the
circumstances of the murder to find Willis unsuitable for parole for
the seventh time and at least 18 years into his 15-to-life sentence
was arbitrary and therefore did not comport with the some evidence
standard. It violated due process. The state court's unexplained decision
to the contrary was an unreasonable application of [Hill]. Willis is
entitled to relief under the standard of 28 U.S.C. § 2254(d). ¶ "Having
decided that the petition will be granted, the next issue concerns the
proper remedy. Because Willis has never been found suitable for parole,
the BPH has never moved past the suitability-finding function in [PC]
§ 3041(b) to calculate a term and set a release date as required by
[PC] § 3041(a). It is now time to do so." Id., at pp. 1129, 1136.
(Emphasis added.)

Judge Patel ruled that where the petitioner had repeatedly been denied
parole suitablity without some evidence to deny a term, Willis was denied
due process in the proceedings and applied the facts before her to Order
his term set. Id., at p. 1137. Petitioner has been denied due process.

"The vilest deeds, like poison weeds bloom well in prison air. It's
only what is good in man, that wastes and withers there." (Oscar Wilde.)

The literal preposterousness of Respondent's position and their
assertions that "[T]he court found that Petitioner had not alleged a 'viable
and meritorious argument' supporting his equal protection claim." is evident
when, in fact, case law has made it abundantly clear that the ONLY test
is whether a CURRENT THREAT exists and when professional opinions states
there is NO CURRENT THREAT equal protection attaches.

The Board cited Petitioner's lack of current risk to public safety
and any suggestion otherwise is without foundation and patently unreasonable.
This is confirmed by Respondents own expert witness, notably, in Respondent's
Exhibit 9, at PAGE THREE: ASSESSMENT OF DANGEROUSNESS:, Petitioner's position
is solidly bolstered by the professional opinion not only concerning his
present dangerousness, but his future dangerousness as well: "On the other

1  hand, ..., there is SUBSTANTIAL EVIDENCE supporting a prediction of

2  NONVIOLENCE for this individual." (Emphasis added.)

3  　　And the professional opinions are uncontraverted, as recorded in the

4  Hearing Transcript at p. 57: ("This inmate does not have a mental health

5  disorder which would assess to need treatment, either during his

6  incarceration period or upon parole.").

7  　　The doctor had before him copies of all Reports and Chronos and the

8  Board has never disputed these facts. The doctor duly noted Petitioner's

9  avoidance of long-term substance abuse and carefully reviewed the Record

10  BEFORE making his findings and giving his decidely unqualified opinion.

11  　　Respondents submit that the Board's decision and the lower courts'

12  denial of relief is justified because the Findings made by the panel are

13  supported by reliable evidence. The doctor's findings clearly disputes this

14  fraud and suggests an ulterior motive on someone's part. The doctor read

15  and rationalized, interviewed and reported, and now Respondents seem to

16  cry "Foul." It is hyperbole of the worst sort to demean or cast aspersions

17  upon a stranger and this should be seen as such. All of the matters alleged,

18  even the untrue ones, were known to the various experts over the years who

19  have examined Petitioner's record to prepare a psychological evaluation

20  and they have reported honestly and with strict adherence to their

21  professional oath.

22  　　Respondents have the hiring and firing authority of their own

23  professionals and it appears, that whenever they disagree with a positive

24  finding by their experts, they argue and alledge 'make weight' insinuations

25  then just choose to ignore it and move on to some innocuous conclusion.

26  　　Petitioner is suitable for parole and has been for some time. If

27  intervening events happen in the fetid aire of prison then Respondents must

28

1  accept that they are possibly culpable for the "continuing charade of
2  meaningless hearings", as Judge Parilli noted in Ramirez, "The Board's
3  readiness to make a finding so at odds with the record supports Ramirez's
4  (sic) claim that his parole hearing was a sham. It is not surprising that
5  the trial court regarded the Board's findings with deep suspicion.", supra,
6  at p. 571. This Judge still knows all too well what a sham looks like.

7      It becomes obvious over many years that the Respondent's position is
8  to throw as much of their argument behind the committing offense and hope
9  a reviewing court will see the horribleness of the crime as the only
10  meaningful criteria to judge a Petition's meritoriousness by but when an
11  inmate has readily confessed, as here, taken responsibility from the outset,
12  as here, and programmed well in an acute environment, there is an absolute
13  need to look beyond the crime to today; now. It cannot be that everybody
14  has it wrong but the respondents, can it?

15      Numerous courts have recently cited just this type of obfuscation and
16  determined that either the Board, the state court, or both got it wrong
17  and ordered various forms of relief. There has even been excoriation of
18  some of the various governor's reversals of suitability findings and cited
19  the extraordinary cultural factors involved.

20      Many of the judicial and quasi-judicial bodies are aware of what
21  inner-city influences and peer pressure lead to insofar as negative
22  influences and substance abuse at early stages of development on most inmates
23  results in on those who come before these proceedings and hiding one's head
24  in the sand is the easy way out but ignores the truth: Virtually everyone
25  in life deserves a second chance where change has been shown.

26

27

28

CONCLUSION

It is axiomatic that the Penal Code mandates a fair process where an inmate subject to statutory authority is given a just and meaningful opportunity to benefit from his reformation and lack of risk of danger to public safety to gain his parole release. The courts have long been held the last, best bastion of our constitutional freedoms and a bulwark against their arbitray and capricious abrogation.

We all hold the freedoms of liberty, equality and justice as paramount in value amongst ourselves and to lessen the quality for one is to diminish those same rights to all who deserve to be able to enjoy the right of association and the freedoms embodied therein. This Court has the plenary power inherent in its office and should grant the writ submitted by Petitioner, Order his immediate release from custody or, at the very least, instruct Respondents to provide a new parole suitability hearing that in all ways conforms to the Courts oversight, and maintain original jurisdiction to see that this is so.

WHEREFORE, Petitioner respectfully prays this Honorable Court will grant the writ, Order all available relief prayed for there, and any and further relief as the Court may deem just and proper.

Respectfully submitted this 21st day of February, 2008.

Samuel C.R

Samuel Contreras, pro se